34 So.2d 848

### ATLANTIC COAST LINE R. CO. v. MANGUM.
### 3 Div. 472.

Supreme Court of Alabama.
Feb. 19, 1948.

Rehearing Denied April 15, 1948.

Evans Hinson, of Montgomery, and G. L.
Reeves, of Tampa, Fla., for appellant.

Hill, Hill, Whiting & Rives, J. J. Buffington, and Richard T. Rives, all of Montgomery, for appellee.

FOSTER, Justice.

We have a question here under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. We are of course controlled by the decisions of the United States Supreme Court in respect to its interpretation and application. The question hinges on the effect of the Act of August 11, 1939, abolishing assumption of risk as a defense when an employee is killed or injured "resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier," section 51, supra. Assumption of risk is abolished as a defense by the terms of section 54, supra, Act of August 11, 1939.

The suit is by the administratrix of the engineer of a freight train moving "west" toward Montgomery, which, on September 24, 1945, collided with another train moving "east" on the same track, resulting in the death of plaintiff's intestate. The westbound train was "No. 452," and the eastbound "second No. 180."

The westbound train, which plaintiff's intestate was driving, received an order at Waterford, Alabama, which was approximately sixty-two miles and two to three hours from the point of collision. It was a special train running on orders, not a schedule. That train had as crewmen, besides the deceased engineer Mangum, a fireman named Ward, who was on the engine with the engineer, a conductor named Youngblood, a flagman Fleming, and a brakeman named Johnson, who were in the caboose. They all received or observed a copy of the order at Waterford, which was as follows: "Second 180 run 4 hours and 30 minutes late Day Street Yard to cross at Waterford." The train had a schedule.

It was shown without conflict that all five of the crewmen knew of and understood the order. It was clear and intelligible they said, and under its terms it would not have been difficult for any of them to estimate with reasonable accuracy the position of second 180 as it ran toward them. The train proceeded on its course, and passed Troy to Youngblood, where it stopped to take on water. The signal board was clear, meaning there were no orders. But later one came as to the cancellation of another train, not second 180.

A crewman testified that the conductor was in charge of the train, although the engineer was in charge of its mechanical operation, and both were responsible for the train; but, as between the two, the conductor ranks the engineer. Under rule 819, which was put in evidence, "the conductor is responsible for the safety, prompt movement and proper care of the trains, and the conduct of the men employed thereon; for the heating and ventilation of the cars thereon, and for the signals, lamps and tools entrusted to their care." That rule was then in operation, and applied to the conductor.

The evidence shows that it was the duty of the fireman to call the attention of the engineer to orders if the engineer overlooked them, and it was likewise the duty of other members of the crew.

While rule 819, supra, applied to passenger conductors, rule 882, in the same terms, applied to freight conductors.

It was the duty of the brakeman to call the attention of the conductor to the train order if he saw the order was being overlooked. The rules of the company require the conductor to keep up with the orders and see that they are carried out.

The fireman testified that he failed to call the attention of the engineer to the order, and that if he had done so the accident would not have happened. The conductor testified that neither the flagman nor the brakeman called his attention to the order, and that it was being violated. While at Youngblood, the engineer said to the conductor, in substance, that they were all clear to Montgomery, and would be in Montgomery in an hour, and that there was nothing ahead of No. 58, and the conductor said that's right. No. 58 was not due to leave Montgomery for four or five hours. All five of the crewmen, it appears without conflict, entirely overlooked the order with respect to second 180, and wholly disregarded the train. Their train could have waited at Youngblood on the siding, or could have gone on to Shellborn, where there was a spur, which was only a few miles farther; but, instead of doing so, it proceeded on its course and met second 180 in a headon collision, resulting in the death of the engineer Mangum. The fireman escaped death, and testified in the case.

The most important question argued on this appeal is whether or not the death of engineer Mangum resulted in whole or in part from the negligence of any of the officers, agents or employees of the railroad company.

It is noted that the principle put in effect by the Act of August 11, 1939, abolished completely the defense of assumption of risk, and that the principle of assumption of risk does not enter into the question here of whether the death of the engineer resulted in whole or in part from the negligence of any of the other agents or employees of the defendant.

It is conceded by counsel for plaintiff that without the force and effect of the Act of August 11, 1939, abolishing the defense of assumption of risk, the decisions of the United States Supreme Court are such as that plaintiff would have no right of action.

Those cases spring directly from Davis v. Kennedy, 266 U.S. 147, 45 S.Ct. 33, 69 L.Ed. 212, and Unadilla Valley R. Co. v. Caldine, 278 U.S. 139, 49 S.Ct. 91, 73 L.Ed. 224; both cases having been written by Mr. Justice Holmes. Those cases lay down what is termed the primary duty rule as to an employee charged with the performance of a service under the rules of the company. It was said that, "it was the personal duty of the engineer to positively ascertain whether the other train had passed. His duty was primary as he had physical control of No. 4, and was managing its course. It seems to us a perversion of the statute to allow his representative to recover for an injury directly due to his failure to act as required on the ground that possibly it might have been prevented if those in secondary relation to the command had done more." And in the Caldine case, supra, it was said: "He cannot hold the Company liable for a disaster that followed disobedience of a rule intended to prevent it, when the disobedience was brought about and intended to be brought about by his own acts (citing Davis v. Kennedy, supra). * * * A failure to stop a man from doing what he knows that he ought not to do, hardly can be called a cause of his act. Caldine had a plain duty and he knew it. The message would only have given him another motive for obeying the rule that he was bound to obey."

Those cases have been followed in a number of others adhering to the principle declared to be the "primary duty rule." The principle prior to the amendment of 1939, supra, had been thoroughly and clearly established by that and other decisions of the United States Supreme Court.

Section 53, Title 45 U.S.C.A., which is part of the Federal Employers' Liability Act, provides as follows: "The fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee." But up until the Act of August 11, 1939, assumption of risk was a complete defense to a recovery by an employee, except as to safety appliances. Seaboard Air Line R. R. v. Horton, 233 U.S. 492, 34 S.Ct. 635,

58 L.Ed. 1062, L.R.A.1915C, 1; section 53, Title 45 U.S.C.A.

Since the Act of 1939, supra, there has been no case decided so far as we know by the Supreme Court of the United States wherein the primary duty rule would have had application, in which that rule was given effect.

The case which gives interpretation in a broad way to that Act, supra, is Tiller v. Atlantic Coast Line R. R., 318 U.S. 54, 63 S.Ct. 444, 87 L.Ed. 610, 143 A.L.R. 967. In that case, the Supreme Court did not have before them a state of facts wherein the primary duty rule had application. But that court referred to various aspects of the law affecting the application of the assumption of risk principle in existence at the time of the enactment. The general rule had been that assumption of risk was applicable to an employee who was rendering service to an employer at a place and under conditions which he knew to be dangerous, and which were created or not remedied on account of the negligence of the employer. It was said that he thereby assumed the risk of such danger by voluntarily continuing in the employment under those conditions.

It is clear that the Act of August 11, 1939, destroys assumption of risk as a defense under those circumstances, unless there still remains the principle that if the employee knew of and voluntarily accepted the risk in the particular incident or situation which brought about his injury, he cannot recover. Owens v. Union Pacific R. R., 319 U.S. 715, 63 S.Ct. 1271, 87 L.Ed. 1683; Blair v. Baltimore & Ohio R. R., 323 U.S. 600, 65 S.Ct. 545, 89 L.Ed. 490. This is sometimes called volenti non fit injuria.

It had previously been said that an employee also assumes the risk ordinarily incident to the operation of the business in which he is engaged, which is not due to the negligence of his employer in any way. See, concurring opinion of Justice Frankfurter in the Tiller case, supra. This is but another way of saying that there is no cause of action in his favor, unless there is negligence which in part or in whole causes his injury or death (35 Am.Jur. 549,

550, section 121, p. 717, notes 6 to 12); and so we have little concern with a situation where there was no negligence by the employer.

But that does not reach the question of the primary duty rule, as we have quoted it in the cases of Davis v. Kennedy and Unadilla Valley R. R. v. Caldine, supra. With respect to those cases, the opinion in the Tiller case, supra [318 U.S. 54, 63 S.Ct. 449], has this to say: "Aside from the difficulty of distinguishing between contributory negligence and assumption of risk many other problems arose (before the Act of August 11, 1939). One of these was the application of the 'primary duty rule' in which contributory negligence through violation of a company rule became assumption of risk (citing Davis and Caldine cases, supra). Other complications arose from the introduction of 'promise to repair', 'simple tool', and 'peremptory order', concepts into the assumption doctrine. In the disposition of cases the question of plaintiff's assumption of risk has frequently been treated simply as another way of appraising defendant's negligence, as was done by the court below in the instant case. It was this maze of law which Congress swept into discard with the adoption of the 1939 amendment to the Employers' Liability Act, releasing the employee from the burden of assumption of risk by whatever name it was called. The result is an Act which requires cases tried under the Federal Act to be handled as though no doctrine of assumption of risk had ever existed."

Where in that case the court swept into the discard all theories of primary duty, and other phases of assumption of risk, it was not necessary to refer to each and every case by name on that subject, but it did refer to the principle as declared in the Caldine and Davis cases, supra, as being thus swept into the discard. And while it may be that the principle there declared would have been here controlling, but for the amendment by the Act of 1939, and for the Tiller case, supra, it is certainly not now controlling.

The effect of the holding as to the primary duty rule, as we understand it, was that while the injured employee's neg-

ligent failure to observe a rule or order when it was his primary duty to do so, was in true analysis simply contributory negligence on the part of the injured employee, provided the negligence of other employees contributed to it, it was in substance treated by those cases as assumption of risk so as to make it a defense under the Act which at that time left assumption of risk a good defense, but not contributory negligence. This interpretation of the Tiller case, supra, was so stated in Keith v. Wheeling L. & E. R. R., 160 F.2d 654, by the Circuit Court of Appeals of the Sixth Circuit, certiorari denied 68 S.Ct. 67. In that case, the Circuit Court of Appeals, in which Judges Hicks, Allen and Martin participated, it was clearly and distinctly held that the Supreme Court of the United States in the Tiller case, supra, had destroyed the primary duty rule under those circumstances as a consequence of the amendment destroying assumption of risk as a defense. In that opinion many cases are cited, in which opinions of the United States Supreme Court point out that the question of liability now is one for the jury where there is any evidence of negligence on the part of other agents or employees of the defendant, which may be found by the jury either in part of in whole to have been the cause of the injury or death involved.

As the primary duty rule is thus abolished, the question goes back to sections 51 and 53 of Title 45 U.S.C.A., the Federal Employers' Liability Act, and the problem in respect to count 4 is to determine whether or not the jury was justified in finding that there was negligence on the part of the fireman, who was in the engine with the engineer, or of the conductor, or flagman, or brakeman, who were crewmen on the train, in all overlooking the order; whereas if anyone of them had remembered it, the argument for plaintiff is that the jury could find that it was his duty, in observing that the engineer was about to put the train in a dangerous position with reference to second 180, to call his attention to the order, and thereby the collision would have been averted.

On the inquiry of whether there was negligence of any of defendant's employees which proximately contributed to the result, we refer to the case of St. Louis S. W. R. Co. v. Simpson, 286 U.S. 346, 52 S.Ct. 520, 521, 76 L.Ed. 1152, in which an engineer violated an order leaving a siding when he should have waited, and moved out on the main track. The attention of the conductor was called to this by the brakeman. He procured a copy of the order, and while reading it, the collision occurred. The court quoted from Davis v. Kennedy, supra, what we have set out, and observed: "We do not need to inquire whether a different conclusion would follow if the conductor in the caboose had discovered that the engineer had gone upon the main track through a misunderstanding of a later order, and, discovering this, had failed after a substantial interval of time to give warning of a peril that he could have easily averted. Nothing of the kind appears." The court was discussing a hypothetical situation not then before it, where there is a discovery by the conductor of the misunderstanding of an order by the engineer; and a failure of the conductor to act on that discovery by giving a warning at a time when it probably would have saved the engineer.

The court in that case made no distinction as respects the issue to be submitted to the jury, whether the negligence of the conductor was in failing to warn the engineer or to perform a positive duty as in the language of the Supreme Court of Georgia in Atlantic C. L. R. R. v. Anderson, 200 Ga. 801, 38 S.E.2d 610. In the latter case, the engineer had orders to meet another train at Whigham, Georgia. The rule of the company was that the engineer must give a signal at least one mile before reaching a meeting point, and, on his failure to do so, the conductor must take immediate action to stop the train. The engineer did not give the signal, and the conductor took no action to stop the train. The question of whether the negligence of the conductor contributed with that of the engineer in causing the collision and death of the engineer, which followed, was found to be pertinent, and one of fact and not of law, and in affirming the Court of Appeals of Georgia, 73 Ga.App. 343, 36 S.E.2d 435, in that respect the Supreme Court made the following observation, which this appellant

thinks applies to this case in a way contrary to the contention of plaintiff [200 Ga. 801, 38 S.E.2d 616]:

"The Court of Appeals rightly differentiated between the alleged negligence of the conductor in failing to warn the engineer of facts already within his knowledge, which warning, if given, may or may not have prevented the accident, and the negligence of the conductor in failing to perform a positive duty enjoined upon him which, if performed, unquestionably would have averted the accident."

The court did not refer to the amendment of 1939, nor the Tiller case, supra, and was apparently trying to differentiate the case before it from the Caldine and Davis cases, supra, assuming that they were then authoritative. And were taking the position that the failure of the conductor to perform a positive duty to stop the train did not come within the influence of those cases, in which there was a failure to warn; not appreciating the fact that since the amendment, as interpreted by the Tiller case, supra, a failure to warn the engineer may be negligence when the engineer was apparently neglecting his duty to obey an order. The report of the Anderson case, supra, does not show the date of the accident, whether before or after the amendment of 1939, and of the Tiller case, and only cites cases decided before that amendment. We conclude therefore that they considered the Caldine and Davis cases, supra, still effective, but held that the one considered was not controlled by them as a result of the distinction they were trying to make. That case sheds no light on our inquiry.

■ The foregoing discussion has been with reference to whether the affirmative charge was due appellant as to count 4. We have first treated that subject because counsel have done so. That count charges the negligence of defendant to "one or more of the officers, agents or employees of the defendant employed on the locomotive or train upon which plaintiff's intestate was employed." The evidence is such that we think it was a question for the jury to find whether the negligence of the conductor was in part a proximate contributing cause

of the accident. When the engineer mentioned to the conductor the fact that the way was clear to Montgomery from and at Youngblood, we think the conductor could be held negligent in forgetting the order as to second 180, and his negligence could be found to be a proximate contributing cause because it was his duty to call the attention of the engineer to this order upon discovering that the engineer had overlooked it, and that he intended to proceed in violation of it, but was not conscious of such violation; and because had he not forgotten the order, due to his negligence, and had reminded the engineer of it, the train could and probably would have gone into a siding there, and there waited for second 180 to pass. We think therefore that the affirmative charge was not due appellant on account of count 4.

■ Count 2 charges the negligence of defendant to that of its train dispatcher, in that he "negligently failed to promptly notify the train on which plaintiff's intestate was working as aforesaid, or the conductor and engineer of said train, of information as to the location of defendant's train with which there was a headon collision."

And count 3 charges the negligence of defendant to that of its operator at Youngblood, "in that said operator negligently failed to promptly notify the train on which plaintiff's intestate was working as aforesaid, or the conductor and engineer of said train of information as to the location of defendant's train with which there was a headon collision."

Those counts may be here treated together, since the circumstances claimed to constitute negligence as to them related largely to communications occurring between them while the train No. 452, which plaintiff's intestate was operating was at Youngblood, just a few minutes before the collision at Olustee, about five miles farther toward Montgomery. There was a siding at Youngblood where the train stopped and took on water, and work was done on the fire by the fireman. It had not reached the switch for the siding, which was available for that train to take to avoid meeting second 180, and was the only siding between them, though there was a spur at Shellhorn

a few miles farther, which might or might not have been available and unoccupied. The signal board at Youngblood was "clear," which meant that no orders were there when the train came up. Later it was changed, since an order came in while the train was there. It was that train No. 214 had been cancelled, and which gave occasion to the engineer to remark that there was a clear way to Montgomery. Train orders were given by the dispatcher to operators by a company telephone, reported back to the dispatcher, written out by the operator, and one copy given to the engineer, and one to the conductor, and then it was reported to the dispatcher, and that completed the transaction.

The dispatcher testified that he came on duty after his predecessor had given the order as to the cancellation of No. 214, but he finished it while the train No. 452 was at Youngblood. That the operator at Youngblood asked him if he had any help for that train, that meant information as to some train it was running against, though the operator did not know what orders that train had received before then. During the time when the order as to No. 214 was being completed and in the conversation between them, he told the operator that he could tell them to head in at Youngblood. At another place he testified that he told the operator that if the train (No. 452) was ready to head in, let them head in at Youngblood, and tell them to do so. It should have gone into the siding there. The operator knew second 180 was very close. This direction was verbal. The operator did not tell them what the dispatcher said about going into the siding. But after he saw the train moving on the main track, he called the dispatcher and told him. The dispatcher said he may intend to back in on the siding, but that was not according to rule. There was then no way to communicate with the train. A verbal order was not according to the rule. No other order was given at Youngblood, except the one as to train No. 214.

The order to train 452, given at Waterford, as to the schedule of second 180 was said to be necessary at that place. Train No. 452 was coming from Camp Rucker with cars full of soldiers to be delivered at Troy to the Central of Georgia Railroad. It could not cross over at Waterford to the main line without an order as to train second 180. First 180 was at Waterford. There were four orders given there as to trains, one was as to second 180. No. 452 proceeded to Troy, delivered the soldier cars to the Central of Georgia, and proceeded with nothing but the engine and caboose as a special with no schedule, traveling on orders. The operator at Youngblood was in his small office when the engineer and conductor were in it talking about the way being clear to Montgomery. He says he did not hear the conversation, as he was talking to the dispatcher. The jury could find to the contrary. But he did not deliver the message of the dispatcher to head in on the siding there. He denied receiving such instructions. He and the dispatcher both knew that second 180 was running on a schedule four hours and thirty minutes behind the printed schedule for 180, and was not far off. If the dispatcher told him to tell train No. 452 to head in there, he must have known the danger of not doing so. It was the dispatcher's duty to warn trains of dangers. And the dispatcher must have felt like such a reminder was necessary or prudent in railroad operation. He also knew that a verbal order was not authorized, and that therefore the operator might not deliver it, whereas a written order in the approved manner would have been delivered. He knew that train No. 452 was running on orders, not schedule, and had received several orders at Waterford, two or three hours previously. Would prudence have suggested a meet order given at Youngblood? It did suggest a verbal direction.

We think it was for the jury to say whether the dispatcher was negligent in that transaction, which proximately contributed to the collision, although there was no specific duty required of him by the rules to give another order as to second 180.

What of the operator (Count 3)? The rule book does not seem to require the delivery of a verbal message from the dispatcher to tell them to head in, and the jury could find that he heard the conversation between the engineer and conductor indicating a purpose (evidently through

forgetfulness of the orders) to proceed and not head in and wait, and yet he did not deliver a verbal message to them because the rule book does not say that it was his duty to do. so.

There must be a duty owing by the operator to the train crew, which was not observed, to constitute negligence. The operator testified that the rule book does not say it was his duty to deliver a verbal order, "and that I am not supposed to deliver a verbal order." But he was acting under the direction of the dispatcher, who gave him a verbal message to pass on to the trainmen.

We cannot construe the rule book to mean that in an emergency a verbal order or message need not be delivered because it is verbal, when a failure to do so would apparently cause imminent danger to the lives of the crewmen. We think it more reasonable to infer that the requirement that the orders shall be in writing was intended to protect the company against a misunderstanding of an order, rather than to prevent its delivery when there is a clear and present hazard resulting from it not being delivered. While it probably should have been in writing, the jury could find that the operator should not refuse to pass on a verbal message of such importance intended to avert a danger so imminent. He says he does not remember receiving such an order, but the jury could find otherwise.

We think the affirmative charge was refused as to counts 2 and 3 without error. It was given as to count 1.

■ It is next insisted that the verdict of $24,000 was excessive, citing our case of Louisville & Nashville R. R. v. Grizzard, 238 Ala. 49, 189 So. 203.

Plaintiff's intestate was negligent contributing to his injury or death. That is conceded. Section 53, Title 45 U.S.C.A., provides that when so, the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee. In the Grizzard case, supra, the negligence of the engineer far outweighed that of any other employee. Here it does not. That of plaintiff's intestate was equal to that of the other employees, and his dependents should sustain half the loss. The jury was justified in finding that the loss to his family was $40,000 on a present cash basis, and at the present value of money. The verdict should not exceed half that figure.

A judgment will accordingly be here entered that, unless appellee files a remittitur, as provided by law, with the clerk of this Court within thirty days, reducing the judgment to $20,000, the judgment of the trial court will stand reversed. If such remittitur is duly filed, the judgment for $20,000 with interest from January 24, 1947, the date of the judgment, will stand affirmed. The ten per cent. penalty is not to be assessed, and under such an order the appellee is taxed with the costs of this appeal. The costs as taxed against defendant in the court below will of course stand.

Affirmed conditionally.

GARDNER, C. J., and LAWSON and STAKELY, JJ., concur.

### On Rehearing.

FOSTER, Justice.

It is insisted that the United States Supreme Court has not cast off the primary duty rule of the Caldine and Davis v. Kennedy cases, supra, by affirming without an opinion (68 S.Ct. 203) the case of Hunter v. Texas Electric Rwy., Tex.Civ.App., 194 S.W.2d 281, which gave application to the primary duty rule, whereas in the case of Wheeling & L. E. R. R. v. Keith, 332 U.S. 763, 68 S.Ct. 67, that court denied certiorari to the Circuit Court of Appeals of the Sixth Circuit, which declared that the Tiller case, supra, had held that the amendment of 1939 had swept away the primary duty rule with the principle of assumption of risk.

■ Of course it is our province only to learn what the rule of the United States Supreme Court is as here applicable. Appellant on this application, without adverting to the Keith case, supra, argues that the Hunter case, supra, shows that court did not consider the primary duty rule abolished as indicated in the Tiller case, supra. But we venture a suggestion which is sufficient, in our opinion, to differentiate the two cases. In the Keith case, supra, as

in the instant case, the plaintiff admittedly forgot an order, and thought the track was clear, and proceeded along the line to the point of collision. The conductor had sanctioned the act of Keith, the engineer. The court held that the negligence of the conductor contributed with that of plaintiff, the engineer, in neglecting to obey the order. It is not a case of not stopping a man from doing what he knows that he ought not to do. When a man forgets what he ought to do, it cannot be said that he at the moment knows that he ought not to do it, for it is still the law that if an employee knows of and accepts the risk in a particular incident or situation, which brings about his injury, he cannot recover, Owens v. Union Pacific R. R., supra; Blair v. Baltimore & Ohio R. R., supra, for he then knows what he ought not to do, and there would be no occasion to remind him of something then in his mind. In the Hunter case, supra, the opinion of the Texas court is that plaintiff admitted that he violated the instructions and rules of the company. This violation of the rules was called negligence. But his evidence shows that he was consciously violating them. No excuse was offered, as the opinion states, why he violated the instructions. It was said to be the rule in Texas that when an injured employee is at fault, or his injury is due to his own violation of the rules, or has neglected to comply with a train order, he cannot recover. But this was under the Federal Employers' Liability Act, and the Texas law had no application. It was said that the Federal Employers' Liability Act and statute of Texas require negligence of the railroad to be a proximate contributing cause of the injury, but that those statutes have no application when the violation of an order or rule was the sole efficient cause, and that under the Caldine and Davis v. Kennedy cases, supra, the violation by the engineer of his duty prevents a recovery for injuries as the result of the collision caused by his own disobedience of the rules and instructions. It is apparent that the plaintiff there consciously violated the rules, so that there was no duty to stop him from doing what he knew he ought not to do. But in the Keith case, supra, and in the instant case, he was not doing what he then knew he ought not to do. His forgetfulness for the time being made it as much out of the range of his knowledge as though he had never known. His forgetfulness was negligence only, and of course contributory, but was not necessarily the sole proximate cause. If he had remembered the order when he was at Youngblood, and disregarded it, he would have come under the principle that his conduct was the sole proximate cause. A failure to remind him of a fact then on his mind would not be a contributing factor. So that, as we view the Keith and Hunter cases, supra, they are not inconsistent with each other, nor with our view of the instant case, when the engineer forgot his order. He did not then know he was doing what he ought not to do. In fact his observation to the conductor at Youngblood not only shows that, but also shows that he was merely yielding to one of man's ordinary frailties of mind, forgetfulness. This may have been negligent, but it was not such a conscious disobedience to orders as to make him take all the risk, and relieve the company from responsibility for the concurring negligence of the conductor and other employees whose duty it was to remind him upon being apprised of his forgetfulness.

Until we are better advised by the United States Supreme Court, and as we now view the matter, the Hunter case, supra, does not deny recovery to this plaintiff, and the Keith case, supra, assumes such right to exist.

Application overruled.

GARDNER, C. J., and LAWSON and STAKELY, JJ., concur.