J. Boyd Rogers, Respondent, v. Guy A. Thompson, Trustee for Missouri Pacific Railroad Company, a Corporation, Appellant, No. 43129—265 S. W. (2d) 282.

Court en Banc, March 8, 1954.

· *Richard H. Beeson, David P. Dabbs* and *Dean F. Arnold* for appellant.

*Guy W. Green* and *Trusty, Pugh & Green* for respondent.

608

610

■ BOHLING, C.—J. Boyd Rogers recovered a judgment for $35,000 (after a remittitur of $15,000 on the overruling of the motion for new trial) against Guy A. Thompson, Trustee for Missouri Pacific Railroad Company, a corporation, under the Federal Employers' Liability Act (45 U.S.C.A. § 51 et seq.). Mere ■■■ contributory negligence diminishes the damages but does not bar a recovery under the Act. § 53. The issues presented involve questions respecting the evidence, the instructions, the argument and the amount of the judgment. A statement of the facts in some detail is proper.

Defendant operates interstate trains between St. Louis and Kansas City. It is a single track railroad west of Jefferson City and is operated under train orders and block signals. Plaintiff was the conductor on defendant's westbound train No. 2d 9 when 2d 9 ran into and telescoped the rear Pullman of No. 1st 9 about 7:45 a.m. January 1, 1948, approximately two miles west of Syracuse, Missouri, killing a number of passengers and injuring others. Plaintiff was also injured.

Number 1st 9 was a regularly scheduled passenger train from St. Louis to Kansas City. Number 2d 9 carried only mail, express and baggage. Its crew included Engineer Butler, Fireman Parks, Flagman Journey, a porter and plaintiff, the conductor. It had eight cars, the rear car being a coach, a converted Pullman, for the conductor, porter and flagman to ride.

Plaintiff had worked for defendant about 29 years, the last five as a conductor, and was thoroughly familiar with the railroad between St. Louis and Kansas City.

Second 9 left St. Louis about thirty minutes after 1st 9, and arrived at Jefferson City a little after 3:00 a.m., January 1, 1948, about ten minutes after 1st 9 had departed. At Jefferson City 2d 9 was held fifty-three minutes for signalmen. Plaintiff testified the dispatcher told him they were having trouble with the block signals to the west, but did not say where, or the nature of the trouble. Also: "Q. Did he describe the trouble? A. He said the block signals was out." In connection with an investigation as to the cause of the wreck conducted by the Interstate Commerce Commission plaintiff stated that, when he asked if he had to flag all the blocks he heard were out up there, the dispatcher answered he would try to advise plaintiff at California, and that he, plaintiff, understood all communications were out. The signalmen did not show up and the dispatcher told plaintiff to proceed.

A severe storm had disrupted defendant's block signal and communication systems west of Jefferson City. Plaintiff testified that it had been and was raining and freezing at Jefferson City; that the ground was covered with a sheet of ice when 2d 9 arrived at California; that it was snowing pretty hard at Tipton, but he did not know whether it was snow, or snow and sleet; that the visibility toward the front of the train seemed to be obstructed, but he did not know whether it was the weather, or the steam, or both; that something like sleet was hitting his face; that he could not see out; that he could see the poles along the track only now and then; that the bad weather increased as 2d 9 proceeded west; that the weather "was just about as bad as it could get"; and that only the snow and sleet would interfere with the vision of the enginemen.

· Defendant has train order board signals, located on poles at stations to stop passing trains for train orders, and block signals, known as "home" blocks, "absolute" or "A" blocks, and "intermediate" block signals.

At each end of every siding is a block signal. The "home" signal is the one encountered upon approaching a siding or town. The "absolute" or "A" signal is the one encountered as the train leaves a siding or town. It has a letter "A" on top of it. The "intermediate" signals are located between stations.

A green light permits of the allowable speed ahead for the train. A red light means "stop." It indicates that a train is in the block, or something is wrong with the track or signal wires. A red light on a "home" or an "intermediate" signal requires a stop and then permits the train to proceed at restricted speed on the main track or onto a siding. Telephones are installed at the "A" signals. A red light at an "A" signal requires a stop and telephoning ▮▮▮ to secure a clearance under Rule 509 and proceeding under Rule 509 at low speed, not over 15 miles per hour, and if a clearance cannot be secured to send a flagman out a sufficient distance ahead to protect the train until the next clear signal is reached. Trains on sidings do not affect the block signals.

Many of defendant's operating rules were offered in evidence by the parties. There is no controversy over their wording. We quote or state the substance of the rules considered material.

Under Rules 35 and 99 the flagman is to protect a train, which has stopped or is moving in circumstances where it may be overtaken, by torpedoes and lighted fusees.

Rule 101 (c): "* * * When indications of severe storms, high water, fire or any condition which threatens damage, trains must proceed at restricted speed, and if in doubt as to being able to proceed safely, train must be placed on siding and remain there until it is safe to proceed.

"Conductors and enginemen must make careful inquiries at all stopping places, and when thought advisable make extra stops to ascertain the extent and severity of storms * * *."

Rule 106: "Both the conductor and the engineman are responsible for the safety of the train and the observance of the rules * * *."

Rule 108: "In case of doubt or uncertainty the safe course must be taken."

Rule 509: "When a train or engine is stopped by a Stop-indication, it must stay until authorized to proceed. Upon information from the train dispatcher (or signalman or instructions of train dispatcher) that there is no opposing train in the block, it may, after filling out clearance, when required, proceed at low speed, expecting to find a train in the block, broken rail, obstruction or switch not properly set, to the next signal displaying a Proceed indication. * * *

"If the means of communication fails, or if the train dispatcher or signalman does not know that there is no opposing train movement involved, the train or engine may proceed when preceded by a flagman to the next signal displaying a Proceed or Proceed at low speed indication.

"The requirements of this rule must be repeated at each Stop-indication."

Rule 881: "The general direction and government of a train is vested in the conductor, and all persons employed on the train must obey his instructions." In case of doubt as to the safety of proceeding, "he must consult the engineman and be equally responsible with him for the safety and proper handling of the train * *. He must be vigilant and cautious, not trusting alone to signal or rules for safety. He must require the flagman and other trainmen to observe position of train order signals. * *"

Rule 884: "Conductors must see that subordinates are familiar with their duties, * * instruct them, if necessary, in the proper performance of their work, and caution them as to its risks. * * *"

Rule 885: "Conductors must not allow their duties to interfere with the proper protection of their train and must require their flagmen to act promptly and in accordance with the rules. * *".

Rule 889: "Train men must know by speed of train * * that train is being handled safely and under control, and, when necessary, take immediate action to get train under safe control."

Rule 956 makes the enginemen "jointly responsible with the conductor for the safety of the train and proper observance of the rules * *." Under Rule 963 enginemen must, and firemen when practicable will, maintain a vigilant lookout and carefully note all signals et cetera.

The terms "restricted speed" and "low speed" mean a speed not in excess of 15 miles an hour and permitting of a stop short of any obstruction.

Second 9 left Jefferson City under orders to meet and met 1st 70 at Scott, No. 10 at McGirk, and No. 20 at California.

The "order board" was red for 2d 9 at California; and the ·station operator gave plaintiff and the engineer each a "message" from the chief dispatcher reading: "After you meet No. 20 at California and Second 70 Eng. 2009 at Clarksburg there is no opposing train in block between Clarksburg and M.K.T. crossing." The M.K.T. crossing is about a mile east of Sedalia.

Plaintiff testified that the message meant that there was no eastbound train coming toward 2d 9 and gave no "right to run a signal," or violate any rule, or Rule 509; that the control of the train is in the conductor; that his engineer asked him at California "how I understood the message"; that "I told him it meant just what it said, and nothing else, 'no opposing trains in the block between Clarksburg and M.K.T. crossing'"; that he told his engineer "to . live up to the rules", and that he did not instruct the engineer "to ·run at restricted speed" because: "Why, no, I didn't know there was anything going on"; that the conductor can communicate with the engineer and can slacken the speed or stop the train without the assistance of the engineer; that he did neither; that the "A" block signal at Clarksburg was green, and that he could not see any block signals after Clarksburg.

Upon leaving Clarksburg 2d 9 proceeded through Tipton, Dow · (a siding), Syracuse and to the scene of the collision without stopping, a distance of about 13 miles. Plaintiff's witness Parks put its speed at 30 to 40 miles an hour. Plaintiff testified that he could not see out and did not know its speed, but "I knew where I was at." He did estimate the speed of 2d 9 at 40 miles an hour at Tipton.

Briefly, of defendant's witnesses Engineer Lynam and Conductor Bradley of 1st 9. At California they received an order to meet No. 20 at Tipton and a message that there were no opposing trains between California and Tipton. At Tipton No. 20 stopped and a flagman got off at the engine of 1st 9, and stated he was from 2d 70 and was holding 1st 9 at Tipton for 2d 70. A message at Tipton for 1st 9 stated there would be no opposing train between Tipton and the M.K.T. crossing after 2d 70 passed. First 9 was delayed an hour at Tipton. All the block signals, "home," "A" and "intermediate" from California up to the scene of the collision were red with the exception of an intermediate block at Dow, which was yellow, and 1st 9 stopped at each red block, whistled, and then proceeded at restricted speed (not over 15 miles an hour), except at the yellow block the speed was increased to 30 miles after the rear car passed the signal and until the next signal was reached. Wires were down from Elston to west of Syracuse.

Fireman Parks, plaintiff's witness, testified that Engineer Butler, his engineer, told him the "message" gave him the railroad to Sedalia;

that all block signals he saw after California were red and he remembered calling three to the engineer; that he saw no fusees or torpedoes; that as they rounded the curve at Syracuse it looked like the railroad ended there (it was his first trip west of Jefferson City); that he kept looking and saw the rear end of a train covered with ice and snow, but no marker lights, and called out "rear end"; that Engineer Butler made an emergency application of the brakes but 2d 9's locomotive telescoped the rear Pullman of 1st 9.

■ Instruction No. 1 read: "The court instructs the jury that under the law and the evidence it is your duty to render a verdict for Mr. Rogers and against the defendant, the Trustee of the Missouri Pacific Railroad company, and determine and fix the amount of recovery in accordance with your finding from the evidence under other instructions herein."

Defendant contends said instruction constituted reversible error since plaintiff had the burden of proof on defendant's liability, which he says was contested in the pleadings and at the trial, and that there was sufficient evidence for a finding that plaintiff's negligence was the sole proximate cause of his injuries. Defendant cites, among others, Cluck v. Abe, ■ 328 Mo. 81, 40 S. W. 2d 558, 559[1-3]; Carpenter v. Kurn, 345 Mo. 877, 136 S. W. 2d 997, 1007[12]; State ex rel. Strohfeld v. Cox, 325 Mo. 901, 30 S. W. 2d 462, 465[6]. These cases are to the effect that a party asserting the affirmative of a determinative issue and proof of it is necessary to establish the fact is not entitled to a directed verdict where his proof rests on oral testimony although the opposing party offers no evidence on the issue, as the truth and weight of his evidence, the credibility of his witnesses, remains an issue for the jury.

This general rule is not applicable in unusual situations where defendant in his pleadings or by his counsel in open court admits plaintiff's claim, or by his evidence also establishes plaintiff's claim (Coleman v. Jackson County, 349 Mo. 255, 160 S. W. 2d 691, 693[2], citing authorities; Gardner v. Linwedel, Mo. App., 192 S. W. 2d 613, 617[5]), or where there is no real dispute of the basic facts supported by uncontradicted testimony essential to a claim or an affirmative defense (Wendorff v. Missouri State L. Ins. Co., 318 Mo. 363, 369, 1 S. W. 2d 99, 101[2]; Jackson v. Security Benefit Ass'n, 235 Mo. App. 368, 139 S. W. 2d 1014, 1021[4, 5], reviewing cases). See, among others, Williamson v. Wabash R. Co., 355 Mo. 248, 196 S. W. 2d 129, 132[4-6]; Meade v. Kansas City Pub. Serv. Co., Mo., 250 S. W. 2d 513, 515[1,2]; Mathews v. Loth, 45 Mo. App. 455, 459; 64 C. J. 474, §§ 444, 439, 441, 442; 53 Am. Jur. 310, §§ 386, 385; Annotation, 169 A. L. R. 798. The rule with respect to directed verdicts in the Federal courts appears to be more liberal. Union Pac. R. Co. v. McDonald, 152 U. S. 262, 282-284, 38 L. Ed. 434, 14 S.

616

Ct. 619, 627; Southern Pac. Co. v. Pool, 160 U. S. 438, 440, 40 L. Ed. 485, 16 S. Ct. 338; Wheelock v. Clay, 13 F. 2d 972, 975[7].

The testimony of the engineer and conductor of 1st 9, defendant's witnesses, as well as the testimony of plaintiff's witnesses, established that 2d 9 passed red block signals after leaving Clarksburg without stopping and at a speed (including defendant's witness Journcy) of 35 to 40 miles an hour, which exceeded "restricted speed." The opening statement of defendant's (as well as plaintiff's) counsel was to the same effect. It was also stated in defendant's opening statement and in defendant's argument that plaintiff received some injuries in the collision. Moore v. Carter, 356 Mo. 351, 201 S. W. 2d 923, 929[5]. The evidence presented no real contest over the fact that employees of defendant other than plaintiff were negligent. Defendant has not established error in the giving of Instruction No. 1 under the facts of record.

██ Plaintiff says the negligence of Engineer Butler of 2d 9 was the sole negligence, relying on cases applying the "primary duty rule" and decided prior to the amendment of August 11, 1939 (45 U. S. C. A. § 54), which abolished the defense of assumption of risk in cases under the Federal Employers' Liability Act where the employer was negligent. Davis v. Kennedy (1924), 266 U. S. 147, 45 S. Ct. 33, 69 L. Ed. 212; Unadilla Valley R. Co. v. Caldine (1928), 278 U. S. 139, 142, 49 S. Ct. 91, 73 L. Ed. 224; Frese v. Chicago, B. & Q. R. Co. (1923), 263 U. S. 1, 3, 44 S. Ct. 1, 68 L. Ed. 131; Pere Marquette R. Co. v. Haskins (C.C.A. 6, 1933), 62 F. 2d 806, 808. Other cases are to like effect. The primary duty rule was to the effect that if an employee violated a specific rule or, for instance, a statute and sustained an injury as a result thereof, it was considered a perversion of the statute to allow a recovery on the ground that a subordinate employee might also have been negligent.

Speaking to the amendment of August 11, 1939, supra, the United States Supreme Court in Tiller v. Atlantic Coast Line R. Co. (1943), 318 U. S. 54, 63, 63 S. Ct. 444, 87 L. Ed. 610, 143 A. L. R. 967, said:

"The assumption of risk clause in the statute became the subject of endless litigation. * * Aside from the difficulty of distinguishing between contributory negligence and assumption of risk many other ██ problems arose. One of these was the application of the 'primary duty rule' in which contributory negligence through violation of a company rule became assumption of risk. * * [Citing the Unadilla Valley R. Co. and Davis cases, supra.] Other complications arose from the introduction of 'promise to repair,' 'simple tool,' and 'peremptory order' concepts into the assumption doctrine. * * * It was this maze of law which Congress swept into discard with the adoption of the 1939 amendment to the Employers' Liability Act, releasing the employee from the burden of assumption of risk by whatever name it was called. The result is an Act which requires

cases tried under the Federal Act to be handled as though no doctrine of assumption of risk had ever existed."

Keith v. Wheeling & L. E. R. Co. (1947), 160 F. 2d 654, 657 (certiorari denied, 332 U. S. 763, 68 S. Ct. 67, 92 L. Ed. 348), states the 1939 amendment swept away assumption of risk as a defense and "also did away with the primary duty rule, which was one phase, among others, of assumption of risk." And, after quoting from the Tiller case, supra: "Thus the Unadilla case and the Davis v. Kennedy case were expressly overruled." Atlantic Coast Line R. Co. v. Mangum (1948), 250 Ala. 431, 34 So. 2d 848, 850 et seq., has a more detailed discussion. Mooney v. Terminal R. Ass'n., 352 Mo. 245, 176 S. W. 2d 605, 609, states the Tiller case pointed out that the 1939 amendment "also eradicated such phases of the *defense* of contributory negligence as had persisted in the guise of assumed risk."

Engineer Butler's negligence was not necessarily the sole negligence. If plaintiff were contributorily negligent his negligence would diminish his damages under the Federal Act.

■ Several of defendant's points may be considered together. Defendant objected to plaintiff stating the annual salary he received from defendant on the ground plaintiff had been discharged for his fault in bringing about the collision in question and his age prevented his being employed as a conductor. The objection was overruled. It was then agreed that plaintiff received gross earnings of $4,737.35 in 1947, and, after deductions, net earnings of $3,775.86. Plaintiff's age was 59 at the time of the collision; and he admitted that he had been discharged from defendant's employ for his fault in bringing about the collision and that his discharge was final.

Thereafter, defendant offered to prove that under the "Uniform Employment" practice and rules of all standard Class I railroads plaintiff was not employable in train operating service because he was over 45 years of age and because of his discharge. The offer was denied.

The court refused defendant's "Instruction E," reading: "You are instructed that if you find the issues in favor of plaintiff, then in considering the amount of your verdict you cannot include any amount of loss of earnings, if any, after he was discharged on January 18, 1948, based on what plaintiff would have received from defendant if he had not been injured and had continued to be employed by defendant as a railroad conductor."

Defendant contends plaintiff's earnings for 1947 were inadmissible because plaintiff's discharge for fault and not his injuries were the proximate cause of his not working as a conductor for defendant; that defendant's Instruction E was proper, and that defendant should have been permitted to show as affecting plaintiff's damages that plaintiff was not eligible for employment by certain railroads in a train operating capacity because of his age and his discharge.

The record does not present the ordinary situation. Broadly stated, evidence tending to show plaintiff's ordinary pursuits and the extent to which the injury has or will prevent him from following such pursuits, is admissible; but evidence which is merely speculation on what may happen should be excluded. Usually, among other facts, it is proper to consider ▮▮▮ plaintiff's occupation, the effect of the injury thereon, plaintiff's physical ability to perform his work at the time of injury and thereafter, his earning capacity and earnings. These are evidentiary matters for the consideration of the jury. Plaintiff's authorities are to this effect. Bartlebaugh v. Pennsylvania R. Co., Ohio App., 78 N. E. 2d 410, 413 [5, 6]; McNatt v. Wabash R. Co., 341 Mo. 516, 108 S. W. 2d 33, 41; Abraham v. Gendlin, 172 F. 2d 881, 882[4]; 25 C. J. S. 826, § 162(4); and 15 Am. Jur. 500, § 90. The cases involved the ordinary situation, an innocent victim of another's wrong.

Defendant says that Wilson v. Kansas City Pub. Serv. Co., 354 Mo. 1032, 193 S. W. 2d 5, 9[4], held that an injured plaintiff's earnings are admissible on the issue of loss of earnings because the presumption is indulged that he would have continued to earn that amount but for the injury. Defendant argues that any presumption plaintiff would continue to earn wages as a conductor for defendant disappeared upon his admission that he had been discharged for his fault in the collision. See State ex rel. Strohfeld v. Cox, 325 Mo. 901, 908, 30 S. W. 2d 462, 465[8]; Stack v. General Baking Co., 283 Mo. 396, 223 S. W. 89, 97; Miller v. Union P. R. Co., 63 F. 2d 574, 576[3, 4]. Defendant's case of Fox v. Asheville Army Store, Inc., 216 N. C. 468, 5 S. E. 2d 436, 437[3-6], held certain possible earnings rested in speculation.

A plaintiff may not recover damages for a loss not shown to be a proximate consequence of defendant's wrong. Berry v. Kansas City Pub. Serv. Co., 341 Mo. 658, 108 S. W. 2d 99, 107; Young v. Missouri P. R. Co., 113 Mo. App. 636, 640, 88 S. W. 767, 768. Where an injured person dies from other causes before judgment, damages for impaired earning capacity are confined to such as were sustained up to the time of death and are not to be based upon his life expectancy at the time of injury. Adelsberger v. Sheehy, 336 Mo. 497, 79 S. W. 2d 109, 114[5, 6]; Showen v. Metropolitan St. R. Co., 191 Mo. App. 292, 177 S. W. 791, 792[3].

Plaintiff's prior earnings had evidentiary value on the issue of his damages, notwithstanding the peculiar facts of the instant case. It had some tendency to establish his qualifications as an employee in train operating service and generally. He was not discharged until January 18, 1948. However, additional facts could affect and restrict plaintiff's prior earnings as a basis for recovery. Defendant's offer of proof embraced the consequences of plaintiff's fault for the collision. Plaintiff's contributory negligence would not defeat a re-

covery and like reasons existed for the admission of defendant's offer of proof as existed for the admission of plaintiff's earnings. If established, the offered evidence tended to show that plaintiff had not suffered damages by reason of defendant's negligence to the extent claimed by plaintiff. It was of evidentiary value and the offer should not have been denied. That Conductor Bradley of 1st 9 was discharged and later reinstated or that Flagman Journey was "disciplined 30 demerits" does not change the situation. The reasons for such action by defendant may not exist with respect to plaintiff. For instance: It was 2d 9 that ran into the rear Pullman of 1st 9. Plaintiff was the conductor in charge of 2d 9. Flagman Journey was not charged with the same responsibility that rested upon plaintiff. Whether plaintiff would ever be reinstated as a conductor by defendant rests in conjecture. This also applies to a portion of the argument for plaintiff. Plaintiff says he was not in a physical condition to qualify for railroad employment, but this was not established as a matter of law if material on the issue.

Defendant's Instruction E should have been given. Plaintiff's counsel based his argument on the issue of damages in part on plaintiff's earnings as a conductor for defendant. Plaintiff says the words "if you find the issues for the plaintiff" caused Instruction E to conflict with plaintiff's Instruction No. 1. We think not under [290] the instant record, although the instruction should be more aptly worded. Under other instructions plaintiff's contributory negligence and the amount plaintiff's damages were to be diminished, if he be found negligent, were live issues. And, in this connection we note that the form of verdict instruction, so far as material here, read: "Instruction G. The court instructs the jury that you shall find the issues in favor of the plaintiff and against the defendant and your verdict may be in the following form: 'We, the jury, find the issues for plaintiff and against the defendant and assess his recovery in the sum of $————. * *.'" Plaintiff sued for $50,000. Plaintiff's counsel advised the jury of that fact. The jury returned a verdict for $50,000. No instruction authorized a verdict for the defendant. Plaintiff's Instruction No. 1 (hereinbefore quoted) directed a verdict for plaintiff on the issue of liability. The all-inclusive direction of Instruction G was to find the issues for plaintiff and against defendant. No intelligent juror would consider he was at liberty to return a verdict for defendant on the issue of liability.

It follows that the judgment should be reversed and the cause remanded. It is so ordered. *Ellison, J.,* concurs; *Hollingsworth, Dalton* and *Leedy, JJ.,* and *Conkling, C. J.,* concur in result. *Hyde* and *Tipton, JJ.,* dissent.

PER CURIAM:—The foregoing opinion by BOHLING, C., is adopted as the opinion of the Court en Banc.