Marie D. STATEN, Bertha Grob and Elsie Nicolai, Plaintiffs-Appellants,

v.

ESTATE of Emma Elizabeth ROSE, Deceased, Defendant-Respondent.

No. 53385.

Supreme Court of Missouri, Division. No. 1.

Jan. 13, 1969.

Thurman, Nixon, Smith & Howald, Jeremiah Nixon and James E. Bowles, Hillsboro, for plaintiffs-appellants.

H. L. C. Weier, Dearing, Richeson, Weier, Roberts.& Wegmann, Hillsboro, for defendant-respondent.

WELBORN, Commissioner.

Marie D. Staten, Bertha Grob and Elsie Nicolai each filed a claim of $33,600 against the estate of Emma Elizabeth Rose, deceased, in the Jefferson County Probate Court. The claims were for personal services rendered to the deceased, the sister of the claimants. Pursuant to § 473.420, RSMo 1959, V.A.M.S., the claims were transferred to the circuit court. They were consolidated for a jury trial which produced a verdict against the claimants and in favor of the estate. After their post-trial motions had been overruled, the claimants appealed.

In 1947, Emma Rose, while living on a farm near Golman, in Jefferson County, Missouri, became affected by rheumatoid arthritis. Emma's husband, Max, was the manager of an office building in St. Louis and had an apartment in the city. However, he did return to the farm on weekends.

As the effects of the arthritis became more crippling, Emma's ability to get around became impaired. In 1950, she underwent surgery at Barnes Hospital. Following the surgery, she was unable to straighten her legs below the knees and she was in a wheelchair for the remainder of her life. For a time after the operation she was in a convalescent home in St. Louis County, undergoing physical therapy. She returned to the farm when she left the convalescent home, probably sometime around 1951. The record is unclear as to the precise time. In 1954, her husband, Max died and Emma stayed with her sister, Marie Staten, in St. Louis, for a few weeks, but then she returned to the farm. She remained there, with the exception of periods of hospitalization in 1960 and 1964 for hemorrhaging duodenal ulcer. Following the discharge from the hospital on the second hospitalization on March 14, 1964, she returned to the farm, but shortly thereafter, she fell out of bed one night and lay on the floor for several hours before assistance arrived. Because of this incident, Emma was taken to the home of her sister, Bertha Grob, in Florissant. She remained there until August, 1965 when, at her request, she returned to the farm. On October 31, 1965, she was admitted to the Mountain View Convalescent Home in St. Louis County. She died there on November 24, 1965.

Administration of Emma's estate was opened in the Jefferson County Probate Court. A will, dated November 4, 1965, was admitted to probate as her last will. The will left the 120-acre farm in Jefferson County to Max Rose's cousin, Leo Bischoff. The inventory value of the farm was $20,000. The inventory showed further real estate holdings valued at $24,880 and personal property valued at $23,978. The will made cash bequests totalling $34,500, including bequests of $1,000 to her sisters, Bertha and Elsie, claimants here. The residue of the estate is divided equally among the three claimants here, and John C. Laskowitz, a brother.

On August 30, 1966, the claimants here each filed identical claims in the probate court, each seeking $33,600 for services rendered the deceased from 1947 to the date of her death. All three claims were in the following identical language:

"Keeping house, collecting rents, aiding and management of property, cooking, buying food, feeding animals and farm and lawn work, personal care of deceased, including bathing, dressing, driving around, general nursing care, administering medicine, record keeping, business activities, doing laundry, keeping house, and providing services of a personal and business type for the totally crippled and disabled deceased.

| | |
|---|---|
| "1947 to 1954 at $100.00 a month | $ 8,400.00 |
| "1954 to 1964 at $150.00 a month | 18,000.00 |
| "1954 to date of death, 18 months at $300.00 a month | 7,200.00 |
| "TOTAL | $33,600.00" |

———◆———

■ On this appeal, the claimants seek relief on the grounds that the trial court should have sustained their motion for a directed verdict on the issue of liability and on the grounds that the verdict is against the weight of the evidence.

On the first proposition, appellants cite Hartford Accident And Indemnity Company v. Farmington Auction, Inc., Mo. App., 356 S.W.2d 512, in support of the authority to direct a verdict for plaintiff in a case such as this. That case does recognize that there are cases in which a verdict may be directed in favor of plaintiff. However, the court of appeals held that the case before it was not such a case. In doing so, it quoted the frequently referred to statement found in Coleman v. Jackson County, 349 Mo. 255, 160 S.W.2d 691, 693, as follows:

" * * * It is a generally accepted rule in this state that a verdict may not be directed in favor of the proponent, that is the party upon whom the law casts the final burden of proof. * * * There is, however, a well-recognized exception to the rule. If the opponent, that is the party not having the burden of proof, admits either in his pleadings or by counsel in open court or in his individual testimony on the trial the truth of the basic facts upon which the claim of the proponent rests, a verdict may be directed against him, and if the proof is altogether of a documentary nature and the authenticity and correctness of the documents are unquestioned, and if such proof establishes beyond all doubt the truth of facts which as a matter of law entitled the proponent to the relief sought, and such proof is unimpeached and uncontradicted, the proponent will be entitled to a peremptory instruction. This is upon the theory that there is no question of fact left in the case and that upon the questions of law involved the jury has no right to pass. * * *"

The appellants' fundamental position on this appeal is that all of the evidence in the record was that the appellants did render valuable service to the decedent and that the decedent accepted the benefit of such services. However, appellants do not demonstrate that the record here brings the case within any of the exceptional situations recognized by the above-stated rule as being cases in which a verdict may be directed in favor of the party having the burden of proof. The record here would undoubtedly have supported a verdict in favor of the plaintiffs, but that is not the issue before us. To demonstrate that this case is not within the rule relied upon by appellants, we must analyze at some length the evidence involved.

Initially, some of the matters claimed can be eliminated, without difficulty. As

above stated, each claim was in identical language. Each claimant made a claim for personal services which included "collecting rents, aiding and management of property." The only evidence on this score was that Marie drove Emma to the property involved and the tenants would come down and pay the rent. Ultimately, when Emma became unable to drive, Marie alone made the trips. On two or three occasions, Marie and her son cleaned up rental premises when a tenant moved. Marie "used to call the plumber." In 1955, after Max died, a man was employed to manage the property and he did so thereafter until Emma's death.

There was no evidence that either of the other two claimants, despite their sworn claims, performed any services in collecting rents or "aiding and management of property." The extent of the services rendered by Marie was not shown. The number of pieces of rental property does not appear. The frequency of rental payments was not shown. The evidence was not clear as to the ownership of the property involved. Although some witnesses spoke of it as Emma's, there was evidence that the property belonged to her husband.

The evidence of claimed personal services prior to the death of Max in 1954 was fairly vague. Certainly Marie's statement that, between 1947 and 1954, Emma "didn't need as much care" and that the services rendered during that time were "just little minor things" would, at least, justify a finding against the claimants for that period.

The basic claim of the appellants is that, following Max's death in 1954, the three of them got together and agreed that one of them would go to the farm each weekend and assist Emma. Because of the difficulty occasioned by the Dead Man's Statute, each of the three claimants sought to testify to the activities of the other two. Of course, their arrangement contemplated that only one of them would be there each weekend,

so they were, in effect, attempting to testify to matters which they had not, by and large, actually observed. Insofar as the evidence showed, all three would be there at the same time only on holidays. In any event, the testimony was designed to show that the person whose turn it was to go to the farm, on the weekend she was there, bathed Emma, washed her hair, trimmed her toenails and fingernails, salved her bed sores and did whatever other personal services she required. They would purchase various items for Emma at the stores in the area, with Emma reimbursing them for these expenditures. They worked outside, feeding the livestock (Emma raised sheep and kept chickens on the farm). and working in the garden. They would cook a week's food supply and leave it available for Emma in the refrigerator. They did whatever housecleaning was needed.

After Emma was taken to Bertha's in March, 1964, Bertha prepared her food, a soft diet being required because of Emma's ulcer. Bertha would have to lift Emma and turn her to change the bedclothes. Marie and Elsie alternated evenings going to Bertha's to assist with Emma.

To be considered with this testimony, however, was evidence that various persons were employed to assist Emma, both at the farm and while she was at Bertha's. A Mrs. Easly testified for plaintiffs that she worked for Mrs. Rose for 12½ years. Mrs. Easly was vague as to the dates of her employment. She testified that she fixed Mrs. Rose's meals and took care of the house. She did testify that she did not bathe Mrs. Rose, but did help with her arms and legs. Mrs. Easly did not stay with Mrs. Rose overnight. She would help her out of bed when she arrived in the morning, put on her braces and help her into her wheelchair.

While Emma was at Bertha's she hired a nurse who took care of her, another lady who "bathed her and took care of her and changed the bedclothes and everything,"

according to Bertha. Emma paid these people.

A nurse, Mrs. Steinbach, testified for the defendant that she attended Mrs. Rose twice a week after August, 1960. She gave her shots, bathed her and did whatever she needed. Apparently her visits continued until Mrs. Rose fell from the bed and was taken to Bertha's.

The appellants state that the defendant's evidence showed that the claimants rendered the services upon which their claim was based. The testimony referred to is that of a brother who visited Mrs. Rose occasionally. He stated that "maybe a time or two I seen [his sister] comb her hair * * *." He also said that his sister told him that they alternated weekends going to Emma's. The nurse, Mrs. Steinbach, testified that "Bertha always did the laundry," that the sisters divided weekends coming down, did a week's cooking for Emma when they did and did the shopping for her.

After Emma returned to the farm in August, 1965, her sisters did not make their trips to the farm. This was at Emma's request.

The only evidence relied upon as in the nature of an admission was a statement by Emma, contained in a tape recording: "Marie, Bertha and Elsie have been wonderful, doing everything they can for me." The tape was recorded sometime around 1962.

Emma had made two prior wills. A 1955 will left the bulk of her property to her sisters. A second will in 1959 added a few specific bequests, but still left the bulk of the estate to the sisters and named them executrices. The sisters were aware of the earlier wills.

Viewing all of the evidence, this is simply a case in which the jury were the final arbiters. In some respects, as above noted, proof was entirely lacking as to some of the elements of the claim. The jury could believe or disbelieve the evidence favorable to the claimants. They were not required to believe it. Mrs. Rose's recorded statement was not an admission such as would call for a directed verdict for the claimants. The jury, in fact, had the right to pass upon the authenticity of this evidence, along with all of the rest. There is no admission in the pleadings. There was no solemn judicial admission by counsel. The case was not based upon documentary evidence. Thus, none of the exceptional instances in which a directed verdict may be ordered in favor of the party having the burden of proof is present here. The trial court did not err in refusing to direct a verdict for the appellants.

The claim that the verdict is against the weight of the evidence is on a similar footing. Appellants argue that there is no evidence in the record that plaintiffs did not perform the services nor that Emma did not accept the benefit of such services. They then assert that, since these were the matters submitted to the jury, the jury's verdict is not supported by probative facts. However, under our jury system, a jury may find against a party on his own uncontradicted and unimpeached oral evidence. Cluck v. Abe, 328 Mo. 81, 40 S.W. 2d 558, 560[5]. The weight of the evidence is a matter for the trial court. We are concerned with the subject only in exceptional cases. Robbins v. Robbins, Mo.Sup., 328 S.W.2d 552, 556[7–13]. No exceptional situation is here presented which calls for our considering the weight of the evidence.

Judgment affirmed.

HOUSER and HIGGINS, CC., concur.

PER CURIAM:

The foregoing opinion by WELBORN, C., is adopted as the opinion of the Court.

All of the Judges concur.