William E. BRANDT, Appellant,

v.

George PELICAN, M.D., Respondent.

No. 74829.

Supreme Court of Missouri,
En Banc.

June 29, 1993.

David M. Duree, St. Louis, for appellant.

Stuart M. Haw, St. Louis, Jeffrey P. Ray, Kansas City, for respondent.

THOMAS, Judge.

### Two Related Cases

On this date this Court is handing down two opinions arising out of the same facts and circumstances. The present case (*"Brandt I"*) is a medical malpractice case in which the jury returned a verdict in favor of the defendant. The plaintiff seeks a reversal and a new trial because of ex parte communications between the defendant and his representatives on the one hand and two of plaintiff's treating physicians on the other. In *William E. Brandt v. Medical Associates et al.*, 856 S.W.2d 667 (Mo. banc 1993) (*"Brandt II"*), plaintiff sued George Pelican, the physician in *Brandt I*, and other parties to such ex parte communications for actual and punitive damages by reason of such ex parte communications. We will divide our discussion between the two opinions primarily on the basis of discussing in the respective opinions only the matters that are relevant to the relief sought by the plaintiff in the respective appeals. For a complete understanding of the impact of the physician-patient privilege in this factual setting it will be necessary for the reader to consider both opinions.

### Facts of Medical Malpractice Case

In this present case, plaintiff appeals from a jury verdict in favor of the defendant in this medical malpractice action. The defendant, Dr. Pelican, treated plaintiff, William A. Brandt, for a painful abscess in his anal canal, which developed as a complication associated with Crohn's disease from which Mr. Brandt has suffered for most of his life. Crohn's disease is an inflammation of the bowel or digestive system, which can occur periodically and then go into remission. Mr. Brandt's Crohn's disease had been in complete remission for twenty years, until 1985. In December 1985, he noticed a sore spot near the anus,

or anal canal. He went to see his family physician, Dr. Leo Wacker, who prescribed Flagyl, a medication that Mr. Brandt took for five days as prescribed. Dr. Wacker did not tell Mr. Brandt about any potential side effects of the use of Flagyl and none developed. Mr. Brandt continued to see Dr. Wacker and a general surgeon, Dr. Gerald Behrens, but the abscess continued. On March 10, 1986, Dr. Behrens referred Mr. Brandt to the defendant, Dr. George Pelican, who specializes in gastroenterology. Dr. Pelican undertook to treat Mr. Brandt with the drug, Flagyl, on a long-term basis. His original prescription for Flagyl was renewed from time to time by telephone and continued for six months through and including September 1986.

One of the known side effects of Flagyl is peripheral neuropathy, an extremely painful condition caused by damage to the nerves in the extremities, such as the fingers, hands, toes, and feet. If peripheral neuropathy develops, it "usually" or "commonly" ceases when the patient discontinues taking Flagyl, but on occasion the painful condition continues indefinitely into the future even though Flagyl is discontinued; this condition is called "persistent peripheral neuropathy." Dr. Pelican did not inform plaintiff of the risk of peripheral neuropathy, nor did he caution him that if he experienced any abnormal feelings in his extremities he should stop taking Flagyl immediately and notify his doctors.

Mr. Brandt remained on the Flagyl for six months, through the end of September 1986. On September 12, 1986, he noticed that his handwriting had changed, that pencils were falling out of his hand, and that his signature seemed different. He also then suddenly realized that not only were his hands numb, but his feet were also numb and tingling. This was his first conscious awareness of symptoms of peripheral neuropathy. In retrospect, he also then realized that for several weeks before September 12, 1986, he had been developing other similar neurological symptoms.

In September of 1986 when Mr. Brandt became aware of his neurological symptoms, he returned to Dr. Wacker, who gave him a physical examination and told Mr. Brandt to stop taking the Flagyl immediately, explaining that the neurological symptoms were side effects of the drug. Although Mr. Brandt ceased taking Flagyl, those symptoms have continued, and it is now clear that he suffers from persistent peripheral neuropathy.

Beginning in September 1986, Dr. Ira Kodner, a surgeon, treated Mr. Brandt for the abscess. Dr. Kodner's treatment relied primarily on a surgically implanted seton drain, which drained the abscess and allowed the healing to occur. He used some medications, but not Flagyl. Healing was slow, but ultimately, in July of 1989, the abscess healed, and Mr. Brandt was released as a patient of Dr. Kodner.

In March of 1987, Dr. Gary Myers, a neurologist, first saw Mr. Brandt for diagnosis and treatment of the peripheral neuropathy. Dr. Myers saw plaintiff again in April of 1987 and then almost three years later in January and February of 1990.

Plaintiff brought this action against Dr. Pelican alleging three alternative grounds for recovery: first, Dr. Pelican's failure to inform of the risk of peripheral neuropathy; second, Dr. Pelican's failure to warn the plaintiff to be on the lookout for symptoms of peripheral neuropathy; and, third, Dr. Pelican's failure to properly monitor his patient while he was taking Flagyl.

On August 14, 1990, plaintiff took a videotaped deposition of Dr. Myers. Dr. Kodner's deposition was taken on November 30, 1990. Following these depositions, each of these treating physicians participated in ex parte conversations concerning Mr. Brandt's physical condition with Dr. Pelican and with Paul Myre, an attorney and employee of Medical Defense Associates, the malpractice liability insurer of Dr. Pelican. At trial, Dr. Kodner and Dr. Myers were not called as witnesses by the plaintiff, but they were called by the defendant. Shortly before trial, Dr. Myers agreed to serve as a paid expert witness for the defendant; his testimony described his treatment and diagnosis of Mr. Brandt but consisted primarily of expert opinions. The majority of Dr. Kodner's testimony de-

scribed his three years of treatment of Mr. Brandt, but he also gave some expert opinions. The plaintiff claims that both Dr. Kodner and Dr. Myers changed their testimony from that given in their respective depositions as a result of the ex parte contacts and that plaintiff is therefore entitled to a new trial at which the changed testimony of Dr. Kodner and Dr. Myers will not be admitted.

Following the jury verdict in favor of defendant, the trial court held an evidentiary hearing regarding the ex parte communications with Dr. Kodner and Dr. Myers. As a result of that hearing, the trial court entered an order finding: (1) that there were no improper ex parte communications; and (2) even if there had been improper ex parte communications, there was no prejudice to the plaintiff created by the ex parte contacts.

### Ex Parte Communications With Plaintiff's Treating Physicians

Plaintiff's motion is based upon this Court's decision in *State ex rel. Woytus v. Ryan*, 776 S.W.2d 389 (Mo. banc 1989), and upon *McClelland v. Ozenberger*, 805 S.W.2d 264 (Mo.App.1991). In *Woytus*, this Court held that we would not require the plaintiff to execute medical authorizations allowing defendants to have ex parte discussions with the plaintiff's treating physicians. In *Woytus*, we were not asked to rule, and we did not rule, on the issue of whether the medical privilege contained in section 491.060(5) prohibits such ex parte discussions. *Woytus* overruled *State ex rel. Stufflebam v. Appelquist*, 694 S.W.2d 882 (Mo.App.1985), in which the Court of Appeals, Southern District, required the plaintiff to execute a written authorization permitting the plaintiff's treating physician to engage in ex parte discussions with the defendant's lawyer if the physician was willing to do so.

In *McClelland*, the Court of Appeals, Western District, held that ex parte discussions between plaintiff's treating physician and defense counsel were improper. The court correctly observed that our opinion in

*Woytus* "shows a judicial philosophy that discourages ex parte conversations with plaintiff's doctor." *McClelland*, 805 S.W.2d at 268. The court of appeals in *McClelland* remanded for an evidentiary hearing by the trial court to determine whether plaintiff was prejudiced by such contacts. The court of appeals granted a new trial unless the defendant proved no prejudice.

 This case presents us with the issue of whether ex parte communications with the plaintiff's treating physician are prohibited during the discovery period of litigation and if so, what remedy is available to plaintiff. The plain and simple answer to this issue is found in the express language of section 491.060(5), RSMo Supp. 1992, which reads as follows:

The following persons shall be incompetent to testify:

(5) A physician licensed under chapter 334, RSMo, a licensed psychologist or a dentist licensed under chapter 332, RSMo, concerning any information which he may have acquired from any patient while attending him in a professional character, and which information was necessary to enable him to prescribe and provide treatment for such patient as a physician, psychologist or dentist.

This statute only covers the disclosure of confidential medical information by testimony in court or by formal discovery such as interrogatories, depositions, or production of medical records, hereinafter referred to as the physician-patient testimonial privilege. The statute makes no reference to any duty of the physician to the patient not to disclose confidential medical information of the patient outside the courtroom such as in informal conversation, in interviews, or in correspondence. In *Woytus* we made the same incorrect assumption our courts have made previously under the statute in assuming without stating that the medical privilege contained in section 491.060(5) encompasses all of the law of physician-patient privilege when in fact, by its express terms, it only speaks to the testimonial privilege.

In *State v. Beatty*, 770 S.W.2d 387, 391–92 (Mo.App.1989), the Court of Appeals, Southern District, recognized the limited nature of the statute by holding that by its terms section 491.060(5) only governs testimony. In *Beatty* the physician, a psychiatrist, made an anonymous telephone call to Crime Stoppers reporting information that his patient had disclosed to him in confidence that she had committed a robbery. In the criminal prosecution the defendant, who was the patient, sought to exclude her statements to the police and the articles seized in a search of her apartment following the anonymous call on the grounds that they were the fruits of an illegal search because the telephone call was a gross violation of the defendant's rights under the physician-patient privilege. The defendant relied on section 491.060(5) as the sole basis for her claim. The Southern District held that section 491.060(5) was limited to "testimony" and does not prohibit any other oral communications such as this doctor's telephone call. The Southern District stated:

> If the legislature sees fit to modify the confidentiality statute so as to prohibit physicians ... from revealing ... confidential communications they have received from their patient ..., it has a right to do so; but, until it does, the only prohibition dictated by the statute is that they cannot testify in a court proceeding regarding such confidential communication.

*Beatty*, 770 S.W.2d at 392.

One earlier case had suggested this same idea by way of dicta. In *Cramer v. Hunt*, 154 Mo. 112, 55 S.W. 258 (1900), this Court discussed section 491.060(5) in the context of a case where plaintiff sued a physician for damages arising from an abortion performed on plaintiff's wife. In discussing whether this lawsuit by the husband was a waiver of the wife's medical privilege, this Court observed in dicta that "while the law places no restriction upon [the wife] or the [physician] as to what they respectively say to others about what occurred, it prohibits [the physician] from testifying in any case to such facts without her consent...." *Id.* 55 S.W. at 260.

We agree that the language in section 491.060(5) only covers the testimonial privilege. Moreover, there was no physician-patient privilege under the common law in Missouri or elsewhere. *Klinge v. Lutheran Medical Center of St. Louis*, 518 S.W.2d 157, 164 (Mo.App.1975). *See also* Daniel W. Shuman, *The Origins of the Physician–Patient Privilege and Professional Secret*, 39 S.W.L.J. 661, 676–77 (1985). However, this does not necessarily mean that there is now no protection in our law establishing a duty of the physician not to disclose confidential information of the patient outside of the courtroom such as in an informal conversation, in interviews, or in correspondence. In fact, in *Brandt II* we discuss the obligation of the physician not to disclose confidential medical information; this obligation arises out of the fiduciary relationship between the physician and the patient. We also discuss in *Brandt II* the enforcement of this obligation of confidentiality through a civil action for damages as well as the patient-litigant waiver of this obligation. For purposes of the present case (*Brandt I*), we hold that there is nothing in section 491.060(5) nor in our common law that constitutes grounds for granting plaintiff a new trial because of his physicians' out-of-court disclosures of medical information. Thus, there is no sanction or remedy in the present case for ex parte communications with plaintiff's treating physicians. We overrule *McClelland v. Ozenberger*, 805 S.W.2d 264 (Mo.App.1991), to the extent it is inconsistent with this holding.

We reaffirm our holding in *Woytus* that we will not require the plaintiff to execute medical authorizations authorizing his treating physician to engage in ex parte discussions. It should be noted that the physician cannot be forced over the physician's own objection to engage in informal ex parte discussions with the defense attorney. The contention of the defense in the present case that they were entitled to talk to Dr. Kodner and Dr. Myers acknowledged that such a right is subject to the consent of the doctors and, in fact, in the present situation both doctors willingly

consented to talk to defendant's attorneys. This limitation embodies the proposition that no witness is forced to participate in discovery except through the formal discovery procedures. If a witness refuses to be interviewed or to give a statement, the attorney's only practical recourse is to take the witness' deposition.

### Plaintiff's Treating Physicians Called as Expert Witnesses by Defendant

■ Plaintiff contends that the defendant's use of Dr. Myers and Dr. Kodner as expert witnesses on behalf of the defendant violates the holding of this Court in *State ex rel. McCloud v. Seier,* 567 S.W.2d 127 (Mo. banc 1978). We disagree. In *McCloud,* the defendant sought to have the Court designate plaintiff's treating physician as the examining physician for the defendant under Rule 60.[1] Rule 60 contains a procedure whereby a party (usually the defendant) by motion can request that the court order another party (usually the plaintiff) to submit to a physical or mental examination by a physician. The Rule contains reciprocal provisions by which each party may receive a report of findings from the examining physician. It is common practice for the moving party to suggest to the court the name of the proposed examining physician. In *McCloud* the defendant suggested that the court appoint the plaintiff's treating physician as the examining physician. We held that the Rule does not contemplate such an appointment: "We hold that under our Rule 60, a patient-litigant cannot be required over his objection to submit to an examination by his treating physician at the request of and for the benefit of the patient's adversary." *McCloud,* 567 S.W.2d at 130. *McCloud* does not prohibit a defendant from eliciting an opinion favorable to the defendant from plaintiff's treating physician if the physician holds such opinion. It is common practice to obtain favorable concessions from the other party's expert or treating physician. In any event, *McCloud* does not speak to the issue of whether ex parte communications with the plaintiff's treating physician will be prohibited.

### Inconsistent Testimony Of Plaintiff's Treating Physicians Goes To Weight, Not Admissibility

■ Appellant devotes a substantial portion of his brief to set forth in great detail the extent to which Dr. Myers and Dr. Kodner gave testimony that was inconsistent, incorrect and, in plaintiff's view, in some instances even false. It would extend this opinion far beyond the attention and patience of any reader to set forth the specifics of plaintiff's complaint in this respect. It is sufficient to point out that all of plaintiff's complaints with respect to inconsistencies, changes in testimony, and illogical or incorrect conclusions were played out in full in front of the jury, as the system is designed for them to be. Cross-examination and impeachment are designed to present issues such as these to the jury. In this case, this was fully and fairly done. Plaintiff's complaint about this testimony goes to weight and not to admissibility. To the extent that the plaintiff assesses the cause of the defects he finds in the testimony of Dr. Myers and Dr. Kodner to the ex parte contacts, we point out that the trial judge, who was present through the trial, who saw and heard the testimony of the witnesses, and who had a firsthand opportunity to evaluate the reaction of the jury, determined in an evidentiary hearing held after the trial that plaintiff was not prejudiced by the ex parte contacts. As we are required to do by long-standing precedent, we defer to the trial court's judgment in these matters. *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976). In any event our basic holding herein that ex parte communications with plaintiff's treating physicians are not prohibited by the statute nor by the common law makes this argument by plaintiff superfluous.

### Testimony By Dr. Kodner As To His Experience With Patients Refusing To Take Recommended Drug

■ Plaintiff claims the trial court erred in denying plaintiff's motion to bar certain

1. All references to Rules are to Missouri Supreme Court Rules.

testimony of Dr. Kodner and by refusing plaintiff's instruction withdrawing such testimony. In particular, plaintiff complains of Dr. Kodner's testimony that in treating patients for anal Crohn's disease with medications having side effects more serious than Flagyl, he had never had a patient refuse to follow his recommendation to take the medication after an explanation of the risks. Plaintiff claims this testimony was improper because Dr. Kodner testified he did not consider himself an expert on Flagyl, although he is an expert on surgical management of anal Crohn's disease.

■ First, plaintiff failed to object to this testimony. By failing to object, plaintiff has waived any objection; nothing is preserved on this issue. *Blevins v. Cushman Motors*, 551 S.W.2d 602, 615–16 (Mo. banc 1977); *Moore v. Smith*, 657 S.W.2d 664, 667 (Mo.App.1983). Moreover, plaintiff's argument that Dr. Kodner was not qualified is off the mark; this testimony was not in the form of an expert opinion. Dr. Kodner simply testified to his experience in warning patients about side effects of medications used in connection with the treatment of Crohn's disease. The trial court did not err in failing to bar or withdraw Dr. Kodner's testimony.

### Plaintiff's Motion For A Directed Verdict

■ Plaintiff claims that the trial court erred in failing to direct a verdict on the issue of liability for the plaintiff at the close of all the evidence. In *Coleman v. Jackson County*, 349 Mo. 255, 160 S.W.2d 691 (Mo.1942), this Court set out an all-inclusive rule specifying the special circumstances under which a verdict will be directed in favor of the party having the burden of proof.

> It is a generally accepted rule in this state that a verdict may not be directed in favor of the proponent, that is the party upon whom the law casts the final burden of proof.... There is, however, a well-recognized exception to the rule. If the opponent, that is that party not having the burden of proof, admits either

in his pleadings or by counsel in open court or in his individual testimony on the trial the truth of the basic facts upon which the claim of the proponent rests, a verdict may be directed against him, and if the proof is altogether of a documentary nature and the authenticity and correctness of the documents are unquestioned, and if such proof establishes beyond all doubt the truth of facts which as a matter of law entitled the proponent to the relief sought, and such proof is unimpeached and uncontradicted, the proponent will be entitled to a peremptory instruction. This is upon the theory that there is no question of fact left in the case and that upon the questions of law involved the jury has no right to pass. [Citations omitted.]

*Id.* 160 S.W.2d at 693. In the fifty years since *Coleman*, Missouri courts have often quoted and applied this rule. *See, e.g., Staten v. Estate of Rose*, 435 S.W.2d 679, 681 (Mo.1969); *Medlock v. Farmers State Bank of Texas Co.*, 696 S.W.2d 873, 881 (Mo.App.1985); *Norfolk & W. Ry. v. Riss Intern. Corp.*, 560 S.W.2d 332, 334–35 (Mo. App.1977). In applying the *Coleman* rule, it is important to note that if the directed verdict is to be based upon oral testimony, it must be based upon the testimony of the party who has the benefit of the burden of proof (usually the defendant) and not upon the testimony of the defendant's other witnesses. This reflects the fact that in modern litigation a party is bound by the party's own testimony, *Zabol v. Lasky*, 555 S.W.2d 299, 304 (Mo. banc 1977), but not by the testimony of the party's witnesses. *Young v. Kansas City S. Ry. Co.*, 374 S.W.2d 150, 153 (Mo.1964); *In re Estate of Danforth*, 705 S.W.2d 609, 610–11 (Mo. App.1986). Except for the part of the *Coleman* rule concerning undisputed documentary proof, a directed verdict is not given in favor of the party having the burden of proof no matter how overwhelming that party's evidence may be or how minuscule the other party's evidence may be; a directed verdict in favor of the party having the burden of proof (usually the plaintiff) is never based upon the plaintiff's evidence. This is in recognition of the fact

that the defendant, who has the benefit of the burden of proof, is entitled to try the case with no evidence at all and to rely solely upon the jury disbelieving the plaintiff's evidence. This strategy may result in a loss for the defendant, but it will not be on a directed verdict; the defendant is entitled to have the case go to the jury.

■■■ In his brief, plaintiff quotes the rule for directing the verdict in favor of the plaintiff from *Rogers v. Thompson*, 364 Mo. 605, 265 S.W.2d 282, 287 (Mo. banc 1954), which states: "This general rule is not applicable in unusual situations where defendant in his pleadings or by his counsel in open court admits plaintiff's claim, or *by his evidence* also establishes plaintiff's claim (*Coleman v. Jackson County*, 349 Mo. 255, 160 S.W.2d 691, 693[2], citing authorities; ...." (Emphasis added.) The reference to "by his evidence" suggests that a directed verdict for the plaintiff could be based upon the testimony of the defendant's witnesses as opposed to the defendant's own testimony. However, that statement in *Rogers* cites *Coleman*. *Rogers*, a FELA case, differs from *Coleman* and the present case because in *Rogers* the directed verdict in favor of the plaintiff was based upon the testimony of the defendant's employees. In the case of an individual defendant, a directed verdict based upon oral testimony must be based upon the testimony of the defendant and not upon other witnesses called by the defendant.

■■■ In the present case, Dr. Pelican, the defendant, testified that he did not give the warning, but he did not admit that failure to give such warning was negligence. The plaintiff's argument for a directed verdict on this issue is based upon the fact that his experts and defendant's original expert all testified that the failure to warn constituted negligence. However, this does not meet the requirement of *Coleman* for a directed verdict for the plaintiff on this issue. More importantly, there were substantial issues of causation that were before the jury on all theories. The medical causation issue of whether the Flagyl caused the persistent peripheral neuro-pathy was for the jury, as was the warning/causation issue of whether plaintiff would have refrained from taking Flagyl had he been warned. Even if the testimony of Plaintiff Brandt that he would not have taken Flagyl if warned is the only evidence on that issue, this does not meet the *Coleman* requirement for a directed verdict for plaintiff. Defendant is entitled to try this issue on the theory that the jury may disbelieve Mr. Brandt. Finally, plaintiff's theory of failure to warn plaintiff to stop taking Flagyl and contact his physician immediately if any neurological symptoms appear and the "failure to follow the patient" theory of liability both involved medical issues of causation for the jury as to whether the persistent peripheral neuro-pathy would have been avoided if plaintiff had stopped taking Flagyl when the symptoms first appeared. Plaintiff is not entitled to a directed verdict on liability; the trial court did not err in overruling plaintiff's motion and submitting the case to the jury.

### Conclusion

The judgment is affirmed.

ROBERTSON, C.J., BENTON and LIMBAUGH, JJ., and TURNAGE, Special Judge, concur.

COVINGTON, J., concurs in result in separate opinion filed.

HOLSTEIN, J., concurs in opinion of COVINGTON, J.

PRICE, J., not sitting.

COVINGTON, Judge, concurring in result.

I concur in result. I agree that appellate review requires that the appellate court give deference to the trial court's finding that the plaintiff was not prejudiced by the *ex parte* communications. In most other respects I must respectfully disagree with the majority opinion.

The majority purports to reaffirm *State ex rel. Woytus v. Ryan*, 776 S.W.2d 389 (Mo. banc 1989), to the extent that *Woytus* holds that a court may not require a pa-

tient to authorize the treating physician to engage in *ex parte* discussions with the defendant. *Brandt v. Pelican*, 856 S.W.2d 658, 662 (Mo. banc 1993). The majority goes on to make clear, however, that the authorization is unnecessary.

I acknowledge the technical flaws the majority identifies in *Woytus*. The majority is correct in observing that *Woytus*, in a sense, commingled the underlying concepts of testimonial privilege and confidential relationship. I read the statutes, however, including § 491.060(5), RSMo Supp.1992 [1], and all statutes that recognize the existence of a patient-physician confidential relationship, §§ 578.353, RSMo 1986, 334.265, 192.067, 191.737, 188.070, RSMo 1986, 191.743, 191.656, to affirm a clear legislative determination that the patient-physician confidential relationship remains inviolate except in limited circumstances. The majority also properly recognizes the distinction between the legal and ethical duties of physicians. As a practical matter, however, the duties sometimes appear to coalesce, on the one hand, and to be in potential conflict, on the other, as they are applied in the actual practices of law and medicine. I believe the area of confusion will only increase after today and that the process and those who seek its protections, patients and physicians alike, are better served by a clear directive.

My initial inclination was to concur in the majority opinion for the reason that it appears that its effect will be to chill any conversation between the treating physician and defense counsel, and would most certainly protect the principles underlying the physician-patient confidential relationship, a policy given primacy in *Woytus*. There was another value expressed in *Woytus*, however, that being the need for discovering the truth in the litigation process. *Woytus*, 776 S.W.2d at 391. Some of the dicta in *Woytus*, understandably, I confess, appears to have been employed to frustrate that end. It remains well established in our law, however, that a treating physician who possesses information relevant to a lawsuit should be available to testify regarding medical information relevant to the litigation. It is also clear that defense counsel would not normally risk placing a witness on the stand without having discussed the witness's trial testimony beforehand, and it is not reasonable to expect a defense attorney to disclose his or her trial position by conducting such a discussion in the presence of the patient's counsel.

After today, the door is open wide to *ex parte* contact. Yet, at the same time, the most cautious physician, if aware of the *Brandt* duo, *Brandt v. Pelican* and *Brandt v. Medical Defense Assoc.*, 856 S.W.2d 667, will be aware that he or she is not forced to participate in discovery except through formal discovery procedures, absent consent of the patient, which surely will not be freely given. This leaves the physician-witness at the mercy of conflicting demands, on the one hand being informed by the patient that the patient desires that there be no contact outside of formal discovery, and on the other hand being advised by the defendant of the myriad of reasons why the physician-witness should "cooperate" with the defense. *See Woytus*, 776 S.W.2d at 395. As a practical matter, the physician may be subject to threats from both sides, with the patient alluding to a cause of action for breach of fiduciary duty and defense counsel alluding to all of the repercussions that may occur as a consequence of the physician's failure to "cooperate." Surely this dilemma is desired by no one.

There is a practical solution to the dilemma. As *Woytus* emphasized, our rules of discovery say nothing about informal discovery by *ex parte* communications between attorneys for the defendant and fact witnesses, including the plaintiff's treating physician. *See Woytus*, 776 S.W.2d at 392. I believe that the Court should establish a reasonable procedure that would serve to further the interests inherent in both a medical malpractice lawsuit and in the physician-patient confidential relationship. The procedure would prohibit *ex parte* contact until the obtaining of the physician's

---

**1.** All statutory references are to RSMo Supp. 1992, unless otherwise noted.

deposition as provided by the Rules of Civil Procedure. If the deposition reveals medical information or opinions of benefit to the defendant, the defendant is not thereafter precluded from such *ex parte* contacts with the physician as may be necessary for trial preparation. Any discussions between the defendant and the physician should be limited to the matters bearing on the issues relevant to the litigation, and plaintiff's counsel should at that stage of the litigation be able to advise the physician of those limits. For the patient, the deposition may be used, if appropriate, to impeach subsequent testimony. For the physician, the taking of the deposition constitutes a clear line of demarcation after which *ex parte* discussion may occur within the bounds of the waiver of *McNutt v. Keet*, 432 S.W.2d 597 (Mo. banc 1968).

In summary, the majority's determination to leave the final decision to the physician as to whether *ex parte* communications should occur seems to serve no clear purpose. Either the physician will engage in *ex parte* communications at the request of the defendant or the defendant's representatives, under threat of a possibility of ensuing litigation instituted by the patient for breach of fiduciary duty, or the physician will follow the patient's instructions and refuse all *ex parte* communication. As a practical matter, neither of these approaches appears to me to be satisfactory; there are no assurances for the patient and there is no guidance for the physician. The practical effect of the Court's opinion will be not to encourage, but, rather, to discourage both a patient's communication with his or her physician and disclosure of the truth, the development and discovery of which, as the Court acknowledges, is the primary point of a lawsuit.