### MEDIQ PRN LIFE SUPPORT SERVICES, INC., Plaintiff/Respondent,

v.

### Lloyd ABRAMS, Richard Rothman, Jeffrey Gitt, Michael Chekoudjian, d/b/a Trade Center Associates, A & R Investments, Inc., and Precision Data Products Co., Inc., Defendants/Appellants.

No. 62997.

Missouri Court of Appeals,
Eastern District,
Division Three.

Dec. 13, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 31, 1995.

Case Transferred to Supreme Court March 21, 1995.

Case Retransferred to Court of Appeals May 30, 1995.

Original Opinion Reinstated June 22, 1995.

Thomas Cicardi DeVoto, Timothy J. Bates, St. Louis, for defendants/appellants.

Anthony F. Vaiana, Clayton, for plaintiff/respondent.

CARL R. GAERTNER, Judge.

Plaintiff, Mediq PRN Life Support Services (Mediq), filed suit against Lloyd Abrams, Richard Rothman, Jeffrey Gitt and Michael Chekoudjian, d/b/a Trade Center Associates, A & R Investments (A & R), Precision Data Products (Precision Data), GTE Products Corporation (GTE), and Delfin and Suellen Nieva for property damages incurred when the building Mediq and Precision Data occupied was damaged by fire. Initially, Me-

diq pled a cause of action for property damages based upon common law negligence. Later, Mediq amended its petition to include allegations of negligence per se against Precision Data, Trade Center Associates and A & R for violating the St. Louis County Electrical Code. Mediq claimed the fire was electrical in origin and resulted from the use of an extension cord as permanent branch wiring and the failure to provide sufficient overcurrent protection for the electrical circuit to which the extension cord was connected.

Precision Data filed a crossclaim against Trade Center Associates, A & R, GTE and the Nievas, incorporating Mediq's negligence claims and requesting that fault be apportioned should Mediq prevail. Trade Center Associates and A & R also filed a crossclaim against Precision Data and GTE, incorporating Mediq's negligence claims and requesting indemnification or a distribution of fault should Mediq prevail. Precision Data, Trade Center Associates and A & R later incorporated Mediq's negligence per se claims into their crossclaims.

The case was tried to a jury which returned verdicts in favor of Mediq against Trade Center Associates, A & R and Precision Data for violations of the St. Louis County Electrical Code. The jury found in favor of Precision Data on Mediq's negligence claim, and it returned verdicts in favor of GTE and the Nievas. Prior to jury deliberations, the parties stipulated that Mediq's damages were $72,874.79. Trade Center's damages were found to be $26,976, and Precision Data's damages were found to be $93,-000. The jury apportioned fault 30% to A & R, 30% to Trade Center Associates and 40% to Precision Data.

On July 15, 1992, the trial court entered judgment in accord with the jury's verdict, ordering that: (1) Mediq shall recover from Precision Data, Trade Center Associates and A & R, jointly and severally, $72,874.79; (2) Trade Center Associates shall recover from A & R and Precision Data, jointly and severally, $18,883.20, with fault assessed at $8,092.80 to A & R and $10,790.40 to Precision Data; and (3) Precision Data shall recover from Trade Center Associates and A &

R, jointly and severally, $55,800, with fault assessed at $27,900 to each defendant. On October 23, 1992, the trial court denied A & R and Trade Center Associates' and Precision Data's motions for a new trial or, in the alternative, for judgment notwithstanding the verdict. Precision Data, A & R Investments and Trade Center Associates appeal arguing that Mediq failed to make submissible cases against them.

 In reviewing whether a submissible case has been made, we view the evidence in the light most favorable to plaintiff, giving it the benefit of all favorable inferences and disregarding all evidence contrary to its claim. *Adams v. Children's Mercy Hospital,* 848 S.W.2d 535, 547 (Mo.App.1993). Furthermore, we will not overturn a jury verdict unless there is a complete absence of probative facts to support it. *Nishwitz v. Blosser,* 850 S.W.2d 119, 122 (Mo.App.1993); *Miller v. Gillespie,* 853 S.W.2d 342, 344 (Mo.App.1993). Issues such as the weight of the evidence, credibility of witnesses and resolution of conflicts in the testimony are not subjects of appellate review. *Id.*

The facts, viewed in the light most favorable to Mediq, are as follows. In 1975, pursuant to a lease, Precision Data began occupying a three-room suite at 358 Brooks Drive in one building of a five-building complex located at the intersection of Interstate 270 and Lindbergh Boulevard in Hazelwood, Missouri. On January 4, 1980, the Nievas bought the complex.

At the end of 1982 or the beginning of 1983, Precision Data purchased a computer and converted one of the rooms in its suite into a computer room. During this time, in response to Precision Data's request, the Nievas installed an additional electrical outlet in the northwest corner of the computer room. Rick Hill, an employee of the Division of Electrical Inspection of the St. Louis County Department of Public Works, testified that he could not find a record showing that a permit was obtained in 1982 or 1983 for the installation of any electrical services at 358 Brooks Drive.

On December 28, 1986, Trade Center Associates purchased the five-building complex.

Trade Center Associates conducted a basic inspection of the electrical systems in the complex and found no defects. Trade Center Associates hired A & R to manage the property.[1] In March 1987, Precision Data began occupying the same premises on a month-to-month basis. In August 1987, Mediq began occupying the premises behind and adjacent to Precision Data's suite on a month-to-month basis.

The computer room in Precision Data's suite was approximately 10 feet by 10 feet. A shelf, a refrigerator, a coffee maker and another shelf were located along the south wall. Along the west wall was a file cabinet, a table, a computer and a computer printer. A desk-top attachment was located along the middle of the north wall. A desk was located in the northeast corner immediately adjacent to the desk-top attachment. The computer and printer were plugged into a surge protector which was plugged into the receptacle in the northwest corner. Precision Data also plugged an extension cord into this outlet. Diane Wiesler, a Precision Data employee, testified that the extension cord ran along the northern wall, around the northeast corner and "behind the desk along the east wall." The extension cord provided electrical power to various items on the desk, including a calculator, a telephone answering machine and a fluorescent light. Precision Data used the extension cord for longer than three years prior to the fire. Also, Precision Data stored paper under the desk and under the desk-top attachment, and the walls in the room were lined with paneling made of a wood paper product.

At 8:30 a.m. on April 20, 1988, Wiesler arrived to work before any other Precision Data employees. She entered the computer room and turned on the light on the desk, the coffee maker, the surge protector, the computer and the printer. Facing the west wall as she turned on the surge protector and the computer, Wiesler heard a snap and pop behind her. She turned and looked at her desk but did not see anything unusual. About four or five seconds later, she heard a second pop behind her, and she turned and ran toward the computer. She saw a blue flame traveling up the wall above the receptacle in the northwest corner. She turned off the computer, turned and saw a small flame behind her desk. She ran out of the room to call for emergency assistance. When she returned to the room, the flames were still primarily under her desk but some had started to extend above the desk, burning the paneling on the east wall.

The Hazelwood Fire Department extinguished the fire. During the fire department's investigation, Rick Hill inspected the electrical system in the computer room. Hill determined that much of the branch circuit wiring to which the extension cord was attached did not have proper overcurrent protection. A 30–amp circuit breaker was used to protect the circuit which contained 14–gauge wiring, violating the National Electrical Code (NEC).[2] Hill further found that a flexible cord (extension cord) was used in the same circuit in place of permanent branch wiring in violation of the NEC.[3]

Donald Buettner, a fire investigator and one of Mediq's expert witnesses, testified that he examined the fire scene, took some photographs, recovered debris and interviewed Wiesler. Buettner concluded that the fire was electrical and that it originated in the northeast corner behind the desk. The Hazelwood Fire Department removed the desk from the computer room prior to Buettner's investigation, but it did not remove any of the debris along the north wall. Buettner recovered strands of wires from the northeast corner but admitted that he could not

---

1. A & R and Trade Center Associates filed a joint appellate brief. Hereafter, we will refer to these parties as Trade Center.

2. Section 310–16 of the NEC requires that a particular circuit breaker be used to protect the smallest wire size within a circuit. A 20–amp circuit breaker must be used to protect 12–gauge wire, and a 15–amp circuit breaker is required to protect 14–gauge wire. Thus, a 15–amp circuit breaker is required to protect a circuit that contains both 14– and 12–gauge wiring.

3. Section 400–8(1) of the NEC prohibits using a flexible cord as permanent wiring. Any temporary wiring, including a flexible cord, that is used for three years or longer as branch circuit wiring is considered permanent wiring.

identify the particular cord to which the wire fragments were previously attached.

Tony Echols, an electrical engineer, also testified as an expert for Mediq. He examined the remainder of the fluorescent light fixture that was located on the desk and discovered that two metal components within the fixture had melted and fused together. From this evidence, he concluded that a short circuit had occurred within the light fixture.

Echols next examined the wire strands Buettner recovered from the northeast corner. Echols observed that the insulation, which usually surrounds the wire in a cord, had totally burned off. Also, the ends of the strands of wires had melted and fused, indicating that they had been exposed to an electrical arc, a fault which occurs when an electrical current flows between the gap between two wires. Arcing generates sparks and heat reaching several thousand degrees Fahrenheit. This evidence indicated that electricity continued to flow through the wires after the insulation melted off, making the wire fragments the ignition source of the fire. Echols, however, did not know whether these wire fragments came from the light fixture's power cord or from the extension cord.

Echols also examined the entire electrical circuit that provided power for the extension cord and light. From the outlet in the northwest corner, Echols found that 14–gauge wiring enclosed by conduit ran up through the ceiling to a junction box. From the box, 12–gauge wiring[4] ran to a 30–amp circuit breaker. He concluded that the 30–amp circuit breaker was insufficient to provide proper overcurrent protection for the circuit because the circuit contained 14–gauge wiring, which requires a 15–amp circuit breaker under the NEC.

Echols testified that in his opinion the fire occurred in the following manner. A short circuit occurred in the light which drew excessive current through the extension cord to the light's power cord. Echols calculated that the short drew approximately 255 amperes of electricity. The insulation on the power cord or the extension cord melted, and the exposed wires within the cord began to arc which ignited nearby combustible paper products. Furthermore, the circuit breaker malfunctioned and was not properly matched with the 14–gauge wiring within the circuit which contributed to the cause of the fire. Once the short drew 255 amperes of electricity, the breaker failed to interrupt the flow of electricity which would have prevented the arcing. Had the circuit been protected by a 15–amp breaker, Echols testified, it would have tripped instantaneously with the short circuit.

Mediq offered the deposition testimony of Raymond Weckstein, a quality control manager for an electrical equipment corporation. Weckstein testified that the fire was caused by arcing in the extension cord which ignited combustibles in the area. Mediq also offered the deposition testimony of Douglas Bennett, an electrical engineer retained by GTE to investigate the fire. Bennett concluded that arcing occurred in the extension cord and ignited the fire. Based upon how quickly the fire occurred after Wiesler heard the first pop, Bennett further concluded that the extension cord had been damaged prior to the fire. He also confirmed that the use of the 30–amp circuit breaker violated the NEC and contributed to the cause of the fire. Bennett testified that a 15–amp breaker would have opened in response to the excessive current drawn to the light and would have prevented any arcing.

Ronald Gronemeyer, a fire investigator and expert for GTE, testified that a circuit breaker is designed to sense the amount of current that runs through it and to interrupt the flow of the current if that amount is excessive. He stated that it is possible that a downstream fault, such as the short circuit in Precision Data's light, could draw enough electricity to cause arcing but not enough to trip the circuit breaker.

Bennett then testified for GTE. He pointed out that 300 degrees Fahrenheit is the temperature at which 16–gauge wiring, a common size for extension and power cords,

---

4. It was later contested by some experts that the wiring was 10–gauge. For purposes of the NEC, however, this discrepancy is irrelevant because the circuit contained 14–gauge wiring.

will be damaged. Using this figure, Bennett calculated that an extension cord in good condition will reach 300 degrees in 20 seconds when exposed to 40 amperes of electrical current. However, the condition of the circuit breaker indicated that the circuit was exposed to possibly thousands of amperes of electrical current. Because only a few seconds passed between the time Wiesler turned on the light and the time she noticed flames in the northeast corner, Bennett concluded that it was more likely that hundreds of amperes of electricity, with an upper threshold of 300 amperes, were drawn through the circuit and that the extension cord was damaged prior to the incident. If the circuit had been protected by a 15–amp circuit breaker and if the short had drawn 250 to 300 amperes of electricity, Bennett testified, the breaker most likely would have tripped and prevented any arcing.

## I. Precision Data Appeal

In its first point, Precision Data contends Mediq did not make a submissible case because it failed to prove that Precision Data's extension cord caused the fire. Therefore, Precision Data argues, the trial court erred in overruling its motion for a directed verdict and its motion for a new trial or, in the alternative, judgment notwithstanding the verdict.

■ The violation of an ordinance is negligence per se provided the following four elements are met: (1) there was in fact a violation of the ordinance; (2) the injured plaintiff was a member of the class of persons intended to be protected by the ordinance; (3) the plaintiff's injury is of the type the ordinance was designed to prevent; and (4) the violation of the ordinance was the proximate cause of the injury. *Gipson v. Slagle,* 820 S.W.2d 595, 597 (Mo.App.1991).

■ By using the extension cord in place of permanent branch wiring, Precision Data violated § 400–8(1) of the NEC, which was adopted into the St. Louis County Electrical Code (Code). St. Louis County, Mo., Ordinance # 11545, § 1102.020 (1984).[5] Furthermore, Mediq and the damages it suffered

fall within the purview of the Code, a safety measure designed to protect occupants of buildings from suffering personal and property damages due to faults in electrical systems. Precision Data does not contest Mediq's establishment of these elements of its case.

■ Precision Data does assert that the evidence was insufficient to permit the jury to find that its negligence was the proximate cause of the fire and Mediq's damages. Actionable negligence requires proof of a causal connection between the conduct of defendant and the resulting injury to plaintiff. Proximate cause exists if defendant's negligence sets in motion the chain of circumstances leading to plaintiff's injuries or damages. *Schaffer v. Bess,* 822 S.W.2d 871, 876 (Mo. App.1991).

■ Mediq relied on circumstantial evidence to establish causation. A finding essential to recovery may be proved by circumstantial evidence. However, the established circumstances must be such that the facts necessary to support the finding may be inferred and reasonably must follow, the existence of such facts cannot depend on guesswork, conjecture or speculation, and the evidence must tend to exclude every reasonable conclusion other than the one desired. *Stark v. American Bakeries Co.,* 647 S.W.2d 119, 125 (Mo.banc 1983). Furthermore, expert testimony used to establish causation is of no probative value and is insufficient to make a submissible case if it merely points out that defendant's negligence was a possible factor or was extremely likely to have had a causal effect. *Shackelford v. West Central Electric Cooperative, Inc.,* 674 S.W.2d 58, 62 (Mo. App.1984).

■ Mediq presented evidence that the fire originated in the northeast corner of the computer room. A short circuit occurred in the light which drew excessive electrical current to that end of the circuit, and the light fixture's power cord and the extension cord overheated. Furthermore, the wire fragments indicated that arcing occurred behind the desk and ignited the fire. Precision Data

5. Hereafter, references to the Code will be referred to by section number.

did not contest this evidence. It argues Mediq failed to make a submissible case because none of the experts could determine, by examining the wire fragments which showed signs of arcing, whether the fragments came from the extension cord or the light's power cord. However, their testimony cannot be viewed in a vacuum; it must be examined in light of all the evidence Mediq presented.

Diane Wiesler testified that the extension cord ran on the floor from the northwest receptacle, along the north wall, around the northeast corner and a little distance along the east wall behind her desk. Donald Buettner testified that the wire fragments that exhibited signs of arcing were recovered from the northeast corner, where the fire originated. From this fact testimony, the jury could have reasonably concluded that the wire fragments came from the extension cord, the only cord that traversed the northeast corner where the fragments were recovered. Mediq, therefore, offered substantial evidence showing that arcing occurred in the extension cord and caused the fire.

Precision Data offers several counter arguments. First, it argues that Mediq's expert witnesses repudiated their prior testimony on cross-examination by admitting they could not tell from looking at the wire fragments if they came from the extension cord or from the light fixture. Thus, it is claimed, their original testimony loses its probative value. This argument is meritless. All of the experts, except Buettner who lacked expertise in electrical engineering, agreed that the wire fragments indicated that arcing occurred in the northeast corner. This evidence was never repudiated, and, when viewed in conjunction with Buettner's and Wiesler's testimony, it supports the reasonable inference that arcing occurred in the extension cord.

Precision Data further counters that Mediq piled inference upon inference to establish a causal connection between Precision Data's negligence and the outbreak of the fire. Precision Data attacks Mediq's use of deposition testimony from Douglas Bennett, arguing that Bennett inferred from evidence that the extension cord had been damaged prior to the fire and concluded from this inference that arcing occurred in the extension cord and caused the fire.

■ "[A]n ultimate inference arrived at solely by basing an inference on an inference which is unsupported by the facts is not allowed." *Rob–Lee Corp. v. Cushman,* 727 S.W.2d 455, 459 (Mo.App.1987). This rule against stacking or pyramiding inferences is not a general rule applicable to all situations but a rule of reason applied in the trial court's discretion "to guard against attenuated reasoning, as where an initial inference is drawn from a fact, and other inferences are built solely and cumulatively upon the first, so that the conclusion reached is too remote and has no sound logical foundation in fact." *Wills v. Berberich's Delivery Co.,* 345 Mo. 616, 134 S.W.2d 125, 129 (1939).

■ Precision Data's argument is flawed. It is well-settled that any number of inferences may be drawn in a given case provided that each inference has its own factual foundation. *Id.* 134 S.W.2d at 129. As demonstrated above, Mediq offered substantial evidence, independent of Bennett's testimony, to support the inference that the wire fragments which arced and ignited the fire came from the extension cord. Moreover, after carefully examining Bennett's testimony, it is clear that he did not engage in impermissible inference stacking. Bennett based his conclusion that the extension cord was damaged prior to the fire upon the quickness and the timing of the events described by Diane Wiesler. The inference that the fire was started by the extension cord was based upon the location of the wires which showed signs of arcing. Thus, each inference had a distinct factual basis. Point denied.

In its second point, Precision Data claims the trial court erred in permitting one of Mediq's expert witnesses, Donald Buettner, to testify regarding prior inconsistent statements made by Diane Wiesler and Jack Deister, President of Precision Data. Precision Data argues that the testimony was hearsay and that the court committed prejudicial error in admitting it without requiring Mediq to lay a proper foundation.

■ Precision Data failed to object to this testimony. By failing to object, Preci-

sion Data has waived any objection; nothing is preserved on this issue. *Brandt v. Pelican,* 856 S.W.2d 658, 664 (Mo.banc 1993). Under Rule 84.13(c), plain error affecting substantial rights, though not raised or preserved, may be reviewed in our discretion when we find manifest injustice or a miscarriage of justice has resulted. *Brouk v. Brueggeate,* 849 S.W.2d 699, 702 (Mo.App.1993). In the instant case, plain error review is not justified. Because Buettner relied on Wiesler's and Deister's statements in his investigation, Buettner's testimony was admissible pursuant to § 490.065(3) RSMo.Supp.1993. The record does not reveal Precision Data suffered any manifest injustice or miscarriage of justice due to Buettner's testimony. Point denied.

## II. Trade Center Appeal

Trade Center claims the trial court erred in denying its motion for directed verdict and its motion for judgment notwithstanding the verdict. Trade Center contends that Mediq did not make a submissible case because: (1) Trade Center did not have a duty to inspect the electrical system in Precision Data's computer room and thus did not violate the NEC and the Code; and (2) the defect in the electrical circuit was not the proximate cause of the fire.

In its first point, Trade Center argues that it did not violate the Code because it had no duty to inspect the electrical system for latent defects. Trade Center contends that to make a submissible case of negligence per se Mediq was required to prove not only the existence of a defective condition in the electrical system but also that Trade Center had knowledge, actual or constructive, of the defective condition. Clearly, the use of a 30–amp circuit breaker to protect 14–gauge wiring in the electrical circuit was a defective condition that violated the NEC. Noncompliance with the NEC violates § 1102.020 of the Code in which the NEC was adopted. The issue presented at trial and raised again here is whether Trade Center can be held liable because of this violation of the Code.

Mediq charged that Trade Center violated the Code by failing to maintain in a safe condition the electrical system in Precision Data's computer room. The Code provides that "[a]ll electrical systems, both existing and new, shall be maintained in a safe condition" and that "[t]he owner or a designated agent shall be responsible for the safe maintenance of the electrical systems in any building, structure or premise at all times." §§ 1102.130–1102.140.

Mediq asserts that Trade Center's knowledge of the defect in the electrical system was not an essential element of its negligence claim because Trade Center's omission involved the violation of an ordinance. "Knowledge of the defect or danger is not a necessary element of negligence where the act or omission, in and of itself, involves a violation of a duty, as in case of violation of a statute or ordinance, in jurisdictions [such as our own] where this is regarded as negligence per se, where there is an absolute duty on the owner or person in charge of property to keep it in a safe condition, or where the negligent act or omission of the owner of the premises created the dangerous condition." *Monsour v. Excelsior Tobacco Co.,* 115 S.W.2d 219, 223 (Mo.App.1938); *see also Breeding v. Dodson Trailer Repair,* 679 S.W.2d 281, 287 (Mo.banc 1984). It is undisputed that the electrical system did not conform with the NEC and the Code. Mediq argues that Trade Center had an absolute duty to keep the electrical system safe and it breached this duty by failing to inspect the system, discover the defect and remedy it.

Under common law principles, a landlord is not an insurer of the leased premises, nor is a landlord strictly liable for a latent defect absent actual or constructive knowledge of the defect. A landlord has a duty to make reasonably safe the portions of the leased premises under the landlord's control. *Kilmer v. Browning,* 806 S.W.2d 75, 79 (Mo.App.1991). Trade Center argues that these principles define the duty it owed Precision Data and Mediq regarding the defect in the electrical system. The defect was obviously latent, the area of 14–gauge wiring being concealed by conduit running from the outlet to a junction box above the ceiling. Trade Center argues there was no evidence in this case showing that it had any notice of

the defect; therefore, it had no duty to inspect, discover and remedy the defect.

We agree with Trade Center's interpretation of the maintenance provisions in the Code. Under *Thomas v. Barnes*, 634 S.W.2d 554 (Mo.App.1982), Mediq has no cause of action against Trade Center. The plaintiff in *Thomas* was an 8–year–old girl. She was injured while shopping at a market when a fluorescent light fixture struck her in the face. The market was leased from defendant. *Id.* at 554. Plaintiff sued, basing her claim upon ordinances of the City of St. Louis which provided that "[a]ll buildings and structures and all parts thereof, both existing and new, shall be maintained in a safe and sanitary condition" and that "[t]he owner or his designated agent shall be responsible for the safe and sanitary maintenance of the building or structure and its exitway facilities at all times." *Id.* at 554–55.

The trial court's grant of judgment notwithstanding the verdict in defendant's favor was upheld. Citing common law negligence principles applicable to business invitee cases, we held that the ordinances did not impose liability upon defendant because the lease did not provide that defendant would make repairs and, absent such a contractual provision, such a duty cannot be imposed by an ordinance. The principle guiding our decision was set forth in *Corey v. Losse*, 297 S.W. 32 (Mo.1927), in which the Missouri Supreme Court stated that "[t]he city of St. Louis may adopt ordinances, but they must be in harmony with, and subject to, the Constitution and laws of the state." We further observed that the state legislature has authority to enact statutes that override the common law of the state, *see Derboven v. Stockton*, 490 S.W.2d 301, 314 (Mo.App.1972); § 1.010 RSMo.1986; however, local governments have no such authority to enact ordinances that override the common law. *Thomas*, 634 S.W.2d at 555–56.

Mediq's interpretation of the maintenance provisions conflicts with the common law principles governing a landlord's duty to repair latent defects. The duty enunciated in the maintenance provisions in the Code must be commensurate with Missouri's common law. Therefore, all St. Louis County building owners and their designated agents have a duty to make reasonably safe all electrical systems in their buildings, but they may only be held absolutely liable for latent defects if they have actual or constructive knowledge of any such defects. *See Kilmer*, 806 S.W.2d at 79.

This interpretation of the maintenance provisions is consistent with the principles governing ordinance construction. In construing the meaning of an ordinance, we must give the words their plain and ordinary meaning, consider the entire act and its purposes, and avoid unjust, absurd, unreasonable, confiscatory or oppressive results. *In the Interest of D.M.*, 849 S.W.2d 698, 699 (Mo.App.1993); *City of St. Louis v. Roe*, 823 S.W.2d 29, 31 (Mo.App.1991); *City of Webster Groves v. Erickson*, 763 S.W.2d 278, 279 (Mo.App.1988).

The maintenance provisions apply with equal force to all persons who own buildings in St. Louis County, including owners of single-family dwellings. *See infra* Footnote 7 and accompanying text. Thousands of homes and buildings are sold every year in St. Louis County. Also, the Code, especially the provision adopting the NEC, is amended from time to time.[6] If the maintenance provisions imposed an absolute duty, new owners of buildings and homes in St. Louis County would be required to hire electricians to inspect their entire electrical systems to uncover any latent defects. The same process would be required for all building owners every time an amended version of the NEC is adopted into the Code. Such a result certainly is unjust, unreasonable and oppressive.

Furthermore, in a number of provisions, the Code outlines a system designed to insure that all electrical installations in all buildings in St. Louis County operate in a safe manner. First, the Code requires that only licensed electricians can engage in

---

6. At the time of the fire, the Code followed the 1984 version of the NEC. Today, the Code follows the 1990 version of the NEC.

"making or maintaining electrical installations or installing any electrical material, apparatus or equipment of any kind...." § 1102.080. Second, the Code requires that all persons, firms, corporations, institutions and organizations, both public and private, must obtain a permit from the Office of Electrical Inspection before "installing, erecting or altering material, wiring, fixtures or other apparatus to be used for generation, transmission or utilization of electricity in or on buildings or premises" in St. Louis County. § 1102.090.[7] Third, the Code requires that inspections must be made of "all electrical installations for which permits have been issued" to insure that electrical installations of "all buildings and premises" undertaken "in the course of erection, alteration, reconstruction or repair" comply with the Code. § 1102.100. Furthermore, the Code provides that once an electrical installation is completed for which a permit has been issued: "the permittee shall notify the Office of Electrical Inspection and a final inspection shall be made. No installation shall be covered or concealed until inspected." *Id.*

█ The Nievas, not Trade Center, violated these provisions of the Code. Precision Data asked the Nievas to install a new outlet in the computer room. A new outlet, which contained the defect, was installed in late 1982 or 1983. Trade Center did not buy the property until December 28, 1986. Furthermore, Rick Hill testified that he could not find any record indicating that a permit was obtained in late 1982 or early 1983 for any electrical installation in the building occupied by Precision Data. The Nievas owned the building at the time of the new installation, they implemented and oversaw the installation and failed to obtain a permit and to have the installation inspected, violating numerous provisions of the Code. Mediq, however, chose not to pursue a negligence per se claim against the Nievas.

There is no evidence that Trade Center actually knew of the defective condition in the electrical system. When Trade Center bought the building, the Nievas did not in-

form it of the defect and a cursory inspection did not reveal the condition. Furthermore, Trade Center had no reason to suspect there was a problem with the electrical circuit. Rick Hill and Ron Gronemeyer testified that the presence of a 30–amp circuit breaker in a commercial building is not unusual. Mediq offered evidence that Precision Data experienced some electrical power outages during its tenancy. However, two Trade Center Associates partners, and the Trade Center complex property manager and maintenance man testified that Precision Data never notified them about the electrical problems. Furthermore, Jack Deister testified that he could not recall notifying Trade Center of the electrical problems. Diane Wiesler only recalled notifying the Nievas' property manager. After the fire, she also notified Deister of some the power outages. Trade Center had no notice, actual or constructive, of the defect in the electrical system and therefore did not violate its duty to maintain the electrical system in a reasonably safe manner. Mediq failed to make a submissible case of negligence per se against Trade Center.

In its second point, Trade Center claims Mediq failed to make a submissible case because the defect in the electrical circuit was not the proximate cause of the fire. Because of our holding on Trade Center's first point, we need not address this issue.

The judgment of the trial court in favor of Mediq and cross-claimants Trade Center Associates and A & R against Precision Data is affirmed. The judgment in favor of Mediq and cross-claimant Precision Data against Trade Center Associates and A & R Investments is reversed, and the cause is remanded with directions to enter a new judgment in favor of Trade Center Associates and A & R Investments.

SMITH, P.J., and CRANDALL, J., concur.

---

7. The Code requires owners of single-family dwellings to follow a similar scheme whereby they must obtain a permit "for an addition or repair, modification, or reconstruction of an existing electrical system...." § 1102.096.